IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-75,318






TRAVIS TREVINO RUNNELS, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM POTTER COUNTY






Keller, P.J., delivered the opinion for a unanimous Court.



 On January 29, 2003, while appellant was serving time in prison for an aggravated robbery, he
killed Stanley Wiley, a supervisor at the prison boot factory. As a result, the State charged appellant with
capital murder. (1) Appellant pled guilty. Pursuant to the jury's answers to the punishment special issues
prescribed by law, (2) the trial judge sentenced appellant to death. (3) Direct appeal to this Court is automatic. (4) 
 Appellant raises twelve points of error. Finding that none of his points have merit, we affirm the trial
court's judgment.

I. SUFFICIENCY OF THE EVIDENCE - Future Dangerousness


 In point of error ten, appellant contends that the evidence was legally and factually insufficient to
support the jury's affirmative answer to the future dangerousness special issue. (5) In a legal sufficiency
review on this subject, "[w]e review the evidence in the light most favorable to the jury's verdict to
determine whether any rational trier of fact could have concluded beyond a reasonable doubt that 'there
is a probability that the defendant would commit criminal acts of violence that would constitute a continuing
threat to society.'" (6) We do not conduct a factual sufficiency review of the jury's future dangerousness
determination. (7) Turning to the legal sufficiency question, we now set forth the evidence in the light most
favorable to the verdict.

 Appellant did not enjoy working as a janitor at the prison boot factory. On the morning of the day
of the murder, he expressed anger at the fact that he had not been transferred to being a barber as he had
requested. He told fellow inmate Bud Williams that he was going to be "shipped one way or another" and
that "he was going to kill someone." Appellant said that he would kill Wiley if Wiley said anything to him
that morning. Appellant told another inmate, William Gilchrist, that he planned to hold the boot-factory
plant manager hostage in the office after the other correctional officers had left. Finally, after appellant had
arrived at the boot factory, he told fellow inmate Phillip Yow that he was going to do something.

 During the first shift at the boot factory, appellant approached Wiley, raised a knife, tilted Wiley's
head back, and cut his throat. Appellant then wiped the knife with a white rag and walked back toward
the trimming tables. When Yow later asked appellant why he had attacked Wiley, appellant said, "It could
have been any offender or inmate, you know, as long as they was white." In response to Yow's
explanation that appellant could get the death penalty if Wiley died, appellant responded, "A dead man
can't talk."

 Wiley did die from the injury. It was later determined that the cut was a twenty-three centimeter
long neck wound that transected the external carotid artery and the internal jugular vein and extended in
depth to the spine. A medical examiner found that the force required to inflict the wound was "moderate
to severe." Appellant was twenty-six years old when he committed the offense.

 In addition to the crime before us, the record shows that appellant has been convicted of three
other felonies. In 1993, he was convicted of the second-degree felony of burglary of a building. He was
placed on probation for that felony, but later that year he committed another burglary of a building. As a
result, he received a second conviction and his probation on the first conviction was revoked. In 1997,
appellant was convicted of aggravated robbery, a first-degree felony. That conviction carried a deadly
weapon finding, specifying the deadly weapon as a "firearm."

 Appellant also committed several acts of misconduct in prison. On January, 19, 1999, he hit a
guard in the jaw. On May 3, 2003, he threw urine at a guard. On November 18, 2003, he threw a light
bulb at a guard. And on June 25, 2004, he threw feces at a guard. Several of the State's inmate witnesses
testified that they had never known appellant to be involved in violent activity before the date of the current
offense (January 29, 2003). At least two of those - Williams and Gilchrist - had known appellant for a
significant length of time (eight years for Williams and nine to ten months for Gilchrist). 

 Appellant relies upon the factors set out in Keeton v. State (8) for the proposition that the evidence
does not support the jury's finding that he constitutes a future danger to society. Those factors are:

1. the circumstances of the capital offense, including the defendant's state of mind and
whether he or she was working alone or with other parties;

 

2. the calculated nature of the defendant's acts;

 

3. the forethought and deliberateness exhibited by the crime's execution;

 

4. the existence of a prior criminal record, and the severity of the prior crimes;

 

5. the defendant's age and personal circumstances at the time of the offense;

 

6. whether the defendant was acting under duress or the domination of another at the time
of the commission of the offense;

 

7. psychiatric evidence; and

 

8. character evidence. (9)

 

This list of factors is not exhaustive. (10) Moreover, the factors are "simply guides to the kinds of evidence
that we recognize as tending to support future dangerousness" and are "not [to] be weighed against each
other to determine evidentiary sufficiency." (11)

 The evidence at trial supports viewing a number of the Keeton factors in the State's favor. There
was evidence to suggest that appellant's crime was planned ahead of time and executed with forethought
and deliberation (factors 2 and 3). Appellant had three prior felony convictions, and one of those was a
violent crime involving the use or exhibition of a firearm (factor 4). At age 26, appellant was not particularly
young (factor 5). Appellant was not acting under the domination of another but committed this crime by
himself on his own initiative (factor 6). And appellant had some prison disciplinary infractions involving
violence, which reflect negatively on his character (factor 8). In addition, appellant's prior criminal history
culminating in the present capital murder shows an escalating pattern of violence, which also supports a
finding of future dangerousness. (12) Finally, the jury could have rationally inferred from appellant's reactions
after the murder that appellant lacked remorse, another factor militating in favor of finding him to be a
continuing threat to society. (13) We conclude that the evidence was legally sufficient to support the jury's
answer to the future dangerousness special issue. Point of error ten is overruled.

II. GUILTY PLEA


 In points of error two and three, appellant contends that the trial court failed to fulfill its statutory
duty not to accept a guilty plea "unless it appears that the defendant is mentally competent and that the plea
is free and voluntary." (14) We first address appellant's contention in point three that the trial court failed to
assure voluntariness by failing to ascertain that appellant had a complete understanding of the consequences
of the plea.

 After the indictment was read, the trial court asked appellant for his plea. Appellant then replied
that he pleaded guilty. Immediately after that response, the trial court sent the jury out of the room and
engaged in the following colloquy:THE COURT: Mr. Runnels, you have entered a plea of guilty to the offense charged in
the indictment before this jury. Several things come into play at this point that I need to
visit with you about. First of all, because this is a case in which the State has indicated it's
- that it's seeking the death penalty, it's not a situation where any jury trial can ever be
waived. You understand that?


MR. RUNNELS: Yes, sir.


THE COURT: And that's why the jury is here. However, your - your plea of guilty before
the jury, you need to understand, sir, that if you persist in that plea and I find that that plea
is - is voluntary and that you have done it with full knowledge of the results of your plea
of guilty, I'll instruct the jury to return in accordance with your plea a finding of guilt. Do
you understand that?


MR. RUNNELS: Yes, sir.


THE COURT: That instruction will preclude them from even having the opportunity to
consider whether the State has met its burden of proof. Your plea of guilty in this case -
and this doesn't differ from any other criminal case - will be all the evidence that's
necessary to support a finding of guilt. Do you understand that?


MR. RUNNELS: Yes, sir.


THE COURT: Even though that's true, the State no doubt will put on much of the same
evidence that it would have anyway in order to give the jury an idea of what this case is all
about. Do you understand that?


MR. RUNNELS: Yes, sir.


THE COURT: But there will not be an issue of your guilt or innocence. Do you
understand that?


MR. RUNNELS: Yes, sir.


THE COURT: You understand that you still maintain all the rights and privileges that you
enjoy under the constitution and laws of the State of Texas and of the United States, but
the -- with regard to the jury being able to consider guilt/innocence stage of this trial, that
will not be one of them? You still have the right against self-incrimination, you know. 
You're not going to have to testify in this case. And I only tell you that because there have
been cases in the past where people have said, "Well, my entering a plea of guilty to the
jury is really, in effect, testifying, and nobody told me that I didn't have to do that." And
our court of criminal appeals has said, "No, that's not the case," but -- under Texas law
and the United States constitutional law, but I'm telling you that just to give you a heads
up on that. All right? And you're still going to be able to, you know, call witnesses of your
own, cross-examine witnesses, have all the witnesses testify in front of you. Nothing is
going to change in this trial with regard to all of your rights other than the ability of the jury
to require the State -- and your ability to require the State to prove their case beyond a
reasonable doubt with regard to your guilt or innocence. Do you understand what I've
told you?


MR. RUNNELS: Yes, sir.


THE COURT: Knowing that your plea of guilty, if I receive that, is going to result in you
being found guilty of this case, and knowing that the State is seeking the death penalty in
this case, do you really want to do this?


MR. RUNNELS: Yes, sir.


THE COURT: Okay. The State is still going to, as you've heard us discuss time and time
again for days, they have the burden of proof with regard to the first special issue, and
there will still be evidence entertained with regard to the second special issue, that being
the mitigation issue. You understand that?


MR. RUNNELS: Yes, sir.


THE COURT: So the only thing that's going to change is that I will have to tell this jury
that they must return a finding of guilt if you persist in this plea. Is that what you want to
do? Do you want to persist in it?


MR. RUNNELS: Yes, sir.


THE COURT: Okay.


[DEFENSE COUNSEL]: Your Honor, I have a document I wish to file for the Court. 
I'll provide a copy, unsigned copy, but a copy to the district attorney.


THE COURT: Okay. Mr. Runnels, this affidavit that I've been handed says that you,
having discussed the strategic and tactical aspects of a plea of guilty in this case, freely and
voluntarily decided to enter this plea of guilty, and you have signed that. Is that what you
fully intended to do?


MR. RUNNELS: Yes, sir.


THE COURT: All right. I will file that, then, among the papers of this cause.


The submitted affidavit, signed by appellant on October 26, 2005, stated: "I, TRAVIS TREVINO
RUNNELS, having discussed the strategic and tactical aspects of a plea of guilty in this case, I [sic] have
freely and voluntarily decided to enter a plea of guilty."

 A guilty plea can be voluntary even in a capital case. (15) Even when the defendant is subject to the
ultimate penalty, a trial court does not err in accepting a plea of guilty if the defendant is "thoroughly
admonished as to the free, voluntary and knowing nature of his plea, and to the serious consequences
arising from his decision." (16) In the present case, the trial court carefully admonished appellant of the gravity
and consequences of his decision to plead guilty. During the colloquy, appellant affirmatively indicated that
he understood what he was doing and wished to persist in a plea of guilty. Appellant even submitted an
affidavit stating that the decision to plead guilty was free and voluntary, and the affidavit suggested that the
decision was a matter of strategy and tactics.

 Appellant, however, contends that the trial court's statements regarding his ability to call witnesses
and present mitigating evidence might have misled him into believing that defense witnesses and mitigating
evidence would in fact be presented. Relying upon Burnett v. State (17) for the proposition that a "silent
record" can support a claim that he did not understand the consequences of his plea, he claims that the
record was "silent" as to his understanding regarding whether defense witnesses would be called or
mitigating evidence presented. 

 But the trial court's statements just conveyed to appellant that he had a right to do those things. 
Whether defense witnesses were called and mitigating evidence was actually presented was a matter of
strategy between appellant and his counsel. Aside from the fact that Burnett addressed the requirements
of a harm analysis due to a trial court's failure to give an admonishment required by Article 26.13(a) (18)
rather than the substantive requirements of the provision found in Article 26.13(b), we observe (as
discussed above) that the record is not silent regarding the voluntary and knowing nature of appellant's
guilty plea. Point of error three is overruled.

 We now turn to the claim, advanced in point of error two, that the trial court erred in failing to
inquire into appellant's mental competency before accepting a plea of guilty. In this point of error, appellant
also complains that the trial court adjudged him to be "sane" (as evidenced by an instruction submitted in
the jury charge) but made no determination of his "mental competency." These claims were specifically
addressed and rejected in Kuyava v. State:

As appellant recognizes, this court has long held in interpreting Article 26.13, supra, that
unless an issue is made of an accused's present insanity or mental competency at the time
of the plea the court need not make inquiry or hear evidence on such issue. And this has
been particularly true where the court has had opportunity to observe the accused in open
court, hear him speak, observe his demeanor and engage him in colloquy as to the
voluntariness of his plea. We find nothing in the 1975 amendment to Article 26.13, which
would render these cases inapplicable, although the better practice is for the trial judge to
inquire into mental competence of the accused whether an issue is made of the same or
not.


While prior to the 1973 and 1975 amendments to Article 26.13, the statute used the word
"sane" and while some of the opinions referred generally to "sanity," it was always
understood that the statute had reference to the present sanity of the accused or his mental
competency to stand trial as opposed to insanity at the time of the commission of the
offense (insanity as a defense).


Obviously what happened is that a form of judgment printed prior to the recent
amendments to the statute was used and the word "sane" rather than the words "mentally
competent" is found therein. Since the word "sane" as used in former Article 26.13 and
"present insanity" and "mentally competent" are all synonymous we find no merit in
appellant's contention that the record is devoid of any finding as to his mental competency
to stand trial. (19) 


Here, as in Kuyava, the trial court was able to observe appellant's demeanor during a colloquy on the
voluntariness of his plea. And as in Kuyava, "sane" is used here as a synonym for "mentally competent." 
In addition, appellant fails to point to anything in the record suggesting that he was not mentally competent. 
Point of error two is overruled. 

III. JUDICIAL REMARKS


A. "Reasonable doubt" remark


 In point of error one, appellant contends that the trial court violated his constitutional right to due
process of law by giving the venire panel a flawed definition of "reasonable doubt" that "trivialized" the
State's burden of proof.

 Because the courtroom facilities were not large enough to accommodate the entire panel, the venire
was split into two groups. The complained-of remark was made to the first group in the following
discussion:

Our laws require that every element of an offense be set out in the indictment, the written
instrument upon which we go to trial. And that's the State's burden, is to prove those
things to the jury beyond a reasonable doubt, to your satisfaction, beyond a reasonable
doubt. There is no definition in the law of reasonable doubt. For several years, our --
back a while back, our legislature tried to -- Court of Criminal Appeals tried to define for
us what reasonable doubt might be, and then ultimately discovered it's a really fluid kind
of thing. It's what you personally believe. 


Most people agree, though, and I think these lawyers will probably tell you, that it's
something way up there high. It's not a hundred percent sure, because you can't be a
hundred percent sure of anything unless you were a witness to something that occurred,
and even then you might have some question about it. But if you're a witness in the case,
then you can't sit and judge a case, so we can't get to that point.


We've got these different levels of burdens of proof of folks who bring lawsuits. And in
civil cases, it's a preponderance of the evidence, which simply means the greater weight
of the credible evidence presented to you. You know, more likely than not would be a
way to look at that.


The second level we have is called clear and convincing. That's a civil burden, too, but
it's up a little step higher. It has to do with things like termination of parental rights and
whether something in a divorce case is separate property as opposed to the presumption
that all property on hand is community property. It's a higher burden.


And even higher still is this reasonable doubt. And we all kind of agree that
reasonable doubt is something that really makes you stop and think about and
consider, and it needs to be something that you would -- the level you rise to to make
important decisions in your life.


Appellant complains only about the italicized portion of the trial court's comments, but we have set out the
entire discussion to place the complained-of portion in context. (20)


 Appellant did not object to the trial court's comments. Ordinarily, a failure to object at trial results
in forfeiting complaint on appeal. (21) Even if we were to assume that improper comments by the trial court
with respect to the beyond a reasonable doubt standard could, in an appropriate case, be so egregious as
to constitute "fundamental," reversible error, (22) we do not believe that to be the case here. The italicized
remark is in some respects similar to jury charge language repudiated as "confusing" in Paulson v. State,
but we nevertheless stated in that case that reversible error would not occur if the parties agreed to use that
language. (23) While the parties did not affirmatively "agree" to the comments here, they certainly acquiesced
in them, and the comments here were not made in the jury charge, but were simply introductory comments
made during voir dire. Moreover, while Paulson dealt with a "definition," (24) the trial court here expressly
stated that there was no legal definition of reasonable doubt. In addition, the trial court's earlier description
of the beyond a reasonable doubt standard as "something way up there high" indicates that the trial court's
comments, when viewed as a whole, did not "trivialize" the State's burden of proof. And finally, the jury
charge did not incorporate the complained-of remarks but properly provided that the State had the burden
of proving the future dangerousness special issue beyond a reasonable doubt. Point of error one is
overruled.

B. "Defense will call witnesses" remark


 In points of error four through seven, appellant contends that the trial court erred by stating in its
remarks that the defense would call witnesses. Appellant alleges that this remark violated the Fifth
Amendment by alluding to his potential to testify, violated due process by placing a burden on the defense
that is not required by law, violated an "impartiality" obligation found in Article 38.05, and violated due
process by "diminishing the Defense approach to the case."

 After appellant pleaded guilty and the jury was returned to the courtroom, the following occurred:

THE COURT: Members of the jury, the defendant has entered his plea of guilty to the
charge contained in the indictment before you. I have talked with him and he persists in
his plea of guilty. I have found that that plea is freely and voluntarily entered into, and
because of that, at the conclusion of this case, I will instruct you to return a finding of guilty
of the charges contained in the indictment in this case. 


That does not preclude anything about the presentation of the evidence. The State will still
call witnesses, as will the defense, with regard to other factors in this case. Then both
sides are interested in you having a full and complete opportunity to know everything that
you can about this case in order to make an intelligent decision with

regard to those special issues that we discussed that will still be put to you.


Okay. Do you have any witnesses here that are to be sworn?


(Pause)


THE COURT: Okay. If you folks who intend to testify this morning will please raise your
right hands.

 

(Witnesses sworn)


THE COURT: Okay. If you would step back outside, please, we'll call you in when we
need you. Do not discuss anything about the case among yourselves or with others. 


[DEFENSE COUNSEL]: Your Honor, for the record, we will invoke the Rule. Our
witnesses are under subpoena for the 31st, and they will be instructed as to the Rule.


The record reflects that appellant did not object to the trial court's remarks. Indeed defense counsel noted
that he had witnesses under subpoena. However, when the State rested, defense counsel chose not to call
any witnesses. 

 As we observed earlier, an objection at trial is ordinarily required to preserve error on appeal. By
failing to object, appellant forfeited his claim of error. Assuming arguendo that a judicial remark regarding
the calling of witnesses could, in an appropriate case, be egregious enough to constitute fundamental,
reversible error, the remark in this case did not rise to that level. The remark was brief, made in passing,
and appeared in good faith to have been made in anticipation of what would actually occur at the trial. 
Moreover, the trial court had earlier, during voir dire, emphasized that the defendant retained the
presumption of innocence and did not have to present evidence. To the first half of the panel, the trial court
remarked, "And so the burden of proof is on the State to prove all their allegations by the reasonable doubt
we discussed. The burden does not shift at any time to the defendant for any reason." To the second half
of the panel, the trial court was even more explicit:

The burden of proof in a criminal case is always on the State. It never at any time shifts
to the defendant for any reason. And if they are unable to do that, then the defense is under
no obligation to bring any evidence whatsoever forward. That concept is so strong in our
United States jurisprudence, that if Mr. Sims or Mr. Yontz or Mr. Owen stood up, once
we begin the trial of this case and 12 of you, or 14 of you were sitting up here in this jury
box, and he stood up and I said, "Will you read the indictment to the defendant, please?" 
Read this indictment out. I said, "Mr. Runnels, how do you plead?" And Mr. Runnels
said, "Not guilty," and if Mr. Sims then turned around and said, "The State rests," do you
know what your obligation would be? It would be to find him not guilty, wouldn't it? 
That's how strong that is. And being, you know, relatively sure, probably so, none of
those things get there. A defendant has to put on no evidence whatsoever. That's a good
thing.


Points of error four through seven are overruled.

IV. BATSON


 In point of error eight, appellant contends that the trial court abused its discretion when it overruled
appellant's Batson objection to a peremptory challenge exercised by the State. In a line of cases starting
with Batson v. Kentucky, (25) the Supreme Court has held that the Equal Protection Clause of the Fourteenth
Amendment to the United States Constitution prohibits any party from exercising a peremptory strike
against a prospective juror on the basis of race. (26) The Batson inquiry involves a three-step process: (1)
the opponent of the strike must establish a prima facie case of discrimination, (2) if that is accomplished,
the proponent of the strike must set forth a race-neutral explanation for the strike, and (3) if a race-neutral
explanation is tendered, the opponent of the strike must carry the burden of proving purposeful
discrimination. (27) At the second step of the inquiry, the race-neutral explanation need not be persuasive or
even plausible, so long as the reason is not inherently discriminatory. (28) The persuasiveness or plausibility
of the explanation can be considered in the third step in determining the genuineness of the explanation. (29) 
At the third step, the ultimate burden of persuasion to show purposeful discrimination never shifts from the
opponent of the strike. (30)

 Appellant objected to the prosecutor's peremptory challenge of prospective juror Tinner. He
asserted that Tinner was one of the few black persons on the panel. The trial judge then asked the
prosecutor for a race-neutral explanation, and the prosecutor proffered two explanations at that point. (31) 
First, the prosecutor stated that Tinner served on a jury that rendered a "not guilty" verdict in a homicide
case earlier in the year. Second, the prosecutor claimed that the prospective juror had lived in Tulia, and
he did not want her on the jury because of the highly publicized official misconduct that occurred there. 

 The next day, the prosecutor was sworn and questioned about his reasons. Defense counsel
questioned the prosecutor about whether the prior acquittal made the juror a bad juror for future cases. 
The tenor of that questioning and statements made by defense counsel the day before was that the
prosecutor would have to objectively justify the juror's unfitness to serve on the jury by showing, for
example, that the jury she served on delivered a bad verdict in the prior case. The prosecutor did contend
that a "not guilty" verdict should not have been returned. Regarding the prospective juror's association
with Tulia, defense counsel asserted that Tinner had not lived in Tulia for thirty years and asked whether
the prosecutor could articulate his reasons for not wanting someone on the jury who had contacts with
Tulia. The prosecutor responded that Tinner still had relatives living there, and the prosecutor's personal
feeling was that "Tulia has put a bad name on the criminal justice system in its entirety." Under questioning
from co-counsel, the prosecutor explained that the venire contained another prospective juror who had
served in the prior homicide case with Tinner, and that the prosecutors had concluded that this other
member of the venire also would not be a good juror in the present case. After taking the issue under
advisement, the trial court ultimately overruled appellant's Batson objection.

 We find the State's first reason - that Tinner served earlier that year on a jury that rendered a "not
guilty" verdict in a homicide case - to be sufficient to uphold the trial court's ruling. The reason itself was
clearly race-neutral, passing step two. With respect to step three, appellant provided no evidence to
suggest that the reason was a mere pretext for discrimination. Whether or not the "not guilty"verdict
delivered in that case was in fact a "bad" verdict, the prosecutor was entitled to strike the juror just
because she had served on a jury that delivered a "not guilty" verdict. Moreover, the prosecutor indicated
that he believed the verdict was a bad verdict, and appellant introduced no evidence to suggest otherwise. 
Given our conclusion with respect to the first reason, we need not address the prosecutor's second reason
(contacts with Tulia), except to say that the trial court was within its discretion to believe that appellant did
not prove any discriminatory intent underlying that reason. (32) Point of error eight is overruled. 

V. JUROR MISCONDUCT


 In point of error nine, appellant contends that the trial court erred in denying his motion for new trial
on the ground that a juror engaged in misconduct by using appellant's failure to present evidence at trial as
a circumstance against him. In an affidavit submitted with appellant's motion for new trial, juror Hendrix
stated:

I wish to state that I was concerned that we were called upon to make a decision without
any defense evidence. I was concerned of who would sentence the Defendant once our
decision was made. I do not recall any specific jury misconduct.


Subsequently, the trial court held a hearing, at which Hendrix testified. (33) In response to questioning from
defense counsel, Hendrix testified to the following:

Q. Well, did you have a concern of the defense evidence in that case?


A. Yes.


Q. What was that --


A. May I --


Q. - concern?


A. - express it? I had a concern in my own mind as to, I was just wondering - I - I was
concerned that there was no defense. I don't know the reason there was no defense. I
don't know if there were - they - they gave us a list of - I believe it said 200 witnesses
when we first started this in the questionnaire we filled out. I assumed some of the
witnesses were going to be defense witnesses. I don't have any way of knowing, I just
was -- I was confused why there might not be someone to testify on the defense side. I
don't know if any -- maybe, as far as I know none of the witnesses on that list were
defense witnesses. I don't have a problem with anything except what I was wondering in
my mind.


Q. Do you recall if the defendant testified during that trial?


A. No, the defendant didn't testify during the trial.


Q. What concerns, if any, did you have with that?


A. That does not bother me in the least. I didn't find that the least bit unusual.


Q. When you say the word concern, could you be - could you define that?


A. About what I mean?


Q. Yes.


A. I came to be a juror on a trial here that carried two people's lives. We had a
defendant and we had a - the - the deceased man. I assumed that - I have concern in my
heart for everyone who was involved in this - in this trial who - whose lives are at stake
in this trial. I have just simply felt badly that there was no one to testify in the other young
man's defense, that I was going to get the opportunity to hear.


Q. Did you feel, if there was evidence, that you should have heard that?


A. If there was evidence, yes, I expected to hear any kind of evidence there was, but I
don't know if there was evidence. It was a heartfelt thing for me more than anything. I
had no opinion against anything that happened in the trial. My heart just went out to the
other young man as well, - to this young man as well. Plain and simple.


Q. If you can, were you content to make your decision, the decisions, without hearing
other evidence and what came before the Court?


A. Correct. I was instructed to make my decisions according to the testimony and the
evidence that was presented to me in court, and that's what I did.


The prosecutor then questioned Hendrix, and the following occurred:

Q. Okay. And do you remember -- do you remember the attorneys qualified you on
your ability to hold the State to its burden of proof?


A. Exactly.


Q. All right. And do you recall it being discussed during that process that the defendant
didn't have any burden to prove anything, that the State still had to meet its burden?


A. Correct.


Q. All right. Now, do you recall also the instruction that the State had the burden of
proving that there was a probability the defendant would commit criminal acts of violence
in the future?


A. Yes, I do.


Q. All right. Did you hold the State to its burden in that?


A. Yes, I did.


Q. Was that in any way affected by the fact that you didn't hear any defensive evidence? 
Did you --


A. No, sir.


Q. Okay. Now, the Court -- the Court gave you a written charge, did it not?


A. Gave me a what?


Q. A written instruction when you went to deliberate.


A. Yes.


Q. A written charge, okay.


A. Right.


Q. Was that read to you?


 A. Yes.


 Q. All right. And do you recall this instruction: 


 "Our law provides that a defendant may testify in his own behalf if he elects to do so. 
This, however, is a privilege accorded a defendant, and in the event he elects not to testify,
that fact cannot be taken as a circumstance against him. In this case, the defendant has
elected not to testify, and you are instructed that you cannot and must not consider,
discuss, allude to, comment upon or refer to that fact throughout your deliberations or take
it into consideration for any purpose whatsoever against him." Do you recall that?


A. Correct.


Q. And did you follow that instruction?


A. I did.


Defense counsel then briefly questioned the witness once more:

Q. Do you recall in our conversations since your verdict - 


A. Yes.


Q. - making the statement, quote, "I do not know why there was no defense"?


A. Yes, I do recall that. But I explained just a minute ago what I meant by that.


Q. And you are still bothered to this day that there was no defense in the case?


A. I'm not bothered in the way that - I'm not doing well at explaining myself on this I
don't think. I don't know quite what to do here. I simply - I don't know if there were any
defense witnesses ever involved in this case. That wasn't part of what I knew as a juror. 
I -- I don't know who all of these witnesses on this list were supposed to testify for. The
only thing I was saying is my concern was not in the way the court proceedings were held
or the trial was held or any attorney or anyone in this matter handled this case. My heart
went out to the defendant as well as the victim. My heart went out to the defendant that
I had nothing there personally to help me on the defense side. That's simply what I meant.


 Appellant characterizes Hendrix's testimony as "conflicting," but he claims "although the juror may
have thought she was holding the State to its burden, she was also bothered by the lack of defense evidence
which potentially included Appellant's own testimony." Appellant then quotes Article 38.08 as stating that
"the failure of any defendant to so testify shall not be taken as a circumstance against him," and he then
concludes, "This, however, by implication entered into the deliberations of at least one member of the
Appellant's jury panel." The State responds that any conflict in the testimony was for the trial court to
decide. 

 We see no conflict in Hendrix's testimony, but that fact does not inure to appellant's benefit. There
is simply nothing in the record to suggest that Hendrix improperly used against appellant his failure to
present evidence. She acknowledged that appellant had no burden to present evidence, and she
consistently stated that she held the State to its burden of proof. 

 As for appellant's failure to testify, we observe that appellate counsel failed to cite Hendrix's very
explicit testimony (italicized above) that appellant's failure to testify did not bother her in the least because
she did not find it to be the least bit unusual. Point of error nine is overruled.

VI. CHALLENGE TO THE DEATH PENALTY


 In point of error eleven, appellant contends, "Article 37.071 . . . fails to provide a method by which
the State of Texas determines the 'deathworthiness' of a capital defendant, thereby eliminating consistency
in the decision to seek death and weakening the degree of accuracy required in imposing death in
contravention of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." 
Relying upon Bush v. Gore, (34) appellant argues that the Equal Protection Clause of the Fourteenth
Amendment requires uniform statewide standards to guide prosecutors in deciding when to seek the death
penalty. He also argues that statewide standards are necessary to prevent "the exercise of unfettered
discretion [that] arbitrarily values some peoples' lives more than others" in violation of the Eighth
Amendment. We have decided these claims adversely to his position. (35) Point of error eleven is overruled.

VII. CUMULATIVE ERROR


 In point of error twelve, appellant contends that his right to due process was violated by the
cumulative effect of the following errors: (1) the judicial remark about defense evidence (points of error four
through seven), (2) the judicial remark regarding reasonable doubt (point of error one), (3) the question
of the voluntariness of appellant's plea as well as his competency to enter same (points of error two and
three), and (4) Batson error. We have found no error as to (3) and (4). Claims (1) and (2) were not
preserved, but even if the matters discussed could be reviewed for the possible existence of fundamental
error, for the reasons already outlined, the combined effect of those two alleged errors would not cause
them to rise to the level of fundamental, reversible error. Point of error twelve is overruled.

 Finding no reversible error, we affirm the judgment of the trial court.

Delivered: September 12, 2007

Do not publish
1. See Tex. Pen. Code §19.03(a)(5)(A)("A person commits an offense if the person commits
murder as defined under Section 19.02(b)(1) and . . . the person, while incarcerated in a penal
institution, murders another . . . who is employed in the operation of the penal institution.").
2. See Tex. Code Crim. Proc., Art. 37.071, §2(b)(1), (e)(1). Unless otherwise indicated, all
future references to articles are to the Texas Code of Criminal Procedure.
3. Art. 37.071, §2(g).
4. Art. 37.071, §2(h).
5. See Art. 37.071, §2(b)(1).
6. Russeau v. State, 171 S.W.3d 871, 878 (Tex. Crim. App. 2005), cert. denied, 126 S. Ct.
2982 (2006)(quoting Art. 37.071, §2(b)(1)). 
7. Id. at 878 n.1.
8. 724 S.W.2d 58 (Tex. Crim. App. 1987).
9. Id. at 61.
10. Wardrip v. State, 56 S.W.3d 588, 594 n.8 (Tex. Crim. App. 2001); Keeton, 724 S.W.2d
at 61.
11. McGinn v. State, 961 S.W.2d 161, 168 n.6 (Tex. Crim. App. 1998).
12. Swain v. State, 181 S.W.3d 359, 370 (Tex. Crim. App. 2005), cert. denied, 127 S. Ct.
145 (2006); Guevara v. State, 97 S.W.3d 579, 582 (Tex. Crim. App. 2003).
13. Smith v. State, 74 S.W.3d 868, 872 (Tex. Crim. App. 2002).
14. See Art. 26.13(b).
15. Holland v. State, 761 S.W.2d 307, 322 (Tex. Crim. App. 1988).
16. Id.
17. 88 S.W.3d 633 (Tex. Crim. App. 2002).
18. See id. at 638.
19. Kuyava v. State, 538 S.W.2d 627, 628-29 (Tex. Crim. App. 1976)(citations omitted).
20. To the second half of the panel, the trial court made the following pertinent remarks:


This concept of reasonable doubt, we have really three levels of burdens of proof in our
Texas law. And the lowest of those levels is the level we use in general civil cases, and
that is a preponderance of the evidence. 


* * *


 And it was defined, probably, as just saying the greater weight of the credible evidence
that was presented in the courtroom. More likely than not. And that's good enough to
tip the scales, and that's the burden of proof in a criminal case. There are other type --
excuse me, in a civil case. There are other types of civil cases that require a bit more
proof; for instance, termination of parental rights. If the State or anyone else alleges
that your parental rights should be terminated, then the level of proof rises higher than
preponderance of the evidence. And that level is called clear and convincing evidence. 
That level of clear and convincing evidence means you ought to be pretty darn sure. 
You ought to be just pretty sure that this is the right thing to do. In criminal cases, the
-- our burden is the State must show you beyond a reasonable doubt. You cannot
have a reasonable doubt. If you have a doubt which would be based on reason,
hopefully, it would be, definitionally, I suppose, a reasonable doubt and you would not
be able to convict because they've got to get beyond a reasonable doubt. So that's the
highest level. And it's way beyond, way beyond, pretty darn sure. Our law does not
define it for you. Our law went 200 years without being able to define reasonable
doubt, and then we went through a short period of time where the legislature thought,
"Well, we probably can get close to defining reasonable doubt," and they attempted to
do that. They based that definition on a definition that has been used from time to time
in the federal court system. And then after a few years we abandoned that because it
was once again decided, and where we came back to was, reasonable doubt is a
concept or a theory that is different for each of us. Each of us have our own level. 
Each of us have our own level of -- pain level, what we can -- what we can tolerate. 
Each of us have these different things that we are concerned with. And reasonable
doubt is what you believe it to be. But I'll tell you, it's way past pretty darn sure. That
sounds fair, doesn't it? Before you take someone's life and liberty, you ought to be
way beyond pretty darn sure that that's the right thing to do.
21. See Tex. R. App. P. 33.1(a)(1)(A). 
22. See Blue v. State, 41 S.W.3d 129, 131-33 (Tex. Crim. App. 2000)(plurality op.)(trial
judge's comments were fundamental, reversible error because they tainted presumption of innocence);
Jasper v. State, 61 S.W.3d 413, 420-21 (Tex. Crim. App. 2001)(even if bound to follow plurality
opinion in Blue, judge's comments did not rise to that level).
23. 28 S.W.3d 570, 572-73 (Tex. Crim. App. 2000).
24. Id.
25. 476 U.S. 79 (1986). 
26. See, e.g., Rice v. Collins, 546 U.S. 333, 338 (2006).
27. Id.
28. Id.
29. Purkett v. Elem, 514 U.S. 765, 769 (1995).
30. Collins, 546 U.S. at 338.
31. The prosecutor's proffer of a race-neutral explanation obviates the need to address whether
the defendant satisfied the step one prima facie case requirement. Simpson v. State, 119 S.W.3d
262, 268 (Tex. Crim. App. 2003). 
32. See Guzman v. State, 85 S.W.3d 242 (Tex. Crim. App. 2002)(discussing dual-motivation
analysis in the Batson context). 
33. The State objected to the affidavit and the testimony on the ground that it related to internal
jury deliberations in violation of Tex. R. Evid. 606(b). Citing the gravity of the trial's outcome, the trial
court expressed its intent to "get all the information out on the table" and proceeded to hear Hendrix's
testimony. The State has not filed a notice of appeal or raised a cross-point with respect to the Rule
606(b) issue. In its appellate brief, the State points out that it made the objection, but it does not
specifically complain about the receipt of this evidence. Given our disposition of appellant's point of
error, we need not address the propriety of the trial court's decision to hear the evidence, nor do we
need to address the potential procedural hurdles that the State might face in advancing a Rule 606(b)
complaint on appeal. 
34. 531 U.S. 98 (2000).
35. Roberts v. State, 220 S.W.3d 521, 535 (Tex. Crim. App. 2007); Crutsinger v. State,
206 S.W.3d 607, 611-13 (Tex. Crim. App. 2006), cert. denied, 127 S. Ct. 836 (2006).