

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,019

**MICAH CROFFORD BROWN, Appellant**

**v.**

**THE STATE OF TEXAS**

## ON DIRECT APPEAL FROM CAUSE NO. 27,742
## IN THE 354TH DISTRICT COURT
## HUNT COUNTY

**JOHNSON, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

In June 2013, a jury convicted appellant of murdering Stella Ray in the course of committing or attempting to commit obstruction, retaliation, or terroristic threat. TEX. PENAL CODE § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. TEX.

CODE CRIM. PROC. art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises six points of error. After reviewing appellant's points of error, we find them to be without merit and affirm the trial court's judgment and sentence of death.

STATEMENT OF FACTS

In July 2011, appellant's ex-wife, Stella Ray, was living in her house in Greenville with their two children, two-year-old Willow and three-year-old Colten. She also resided with Wesley Williams, her fourteen-year-old son fathered by her first husband, Tracy Williams. Ray planned to begin new employment in another town, and appellant testified that he was concerned about his ability to see Willow and Colten on a regular basis when Ray moved away. However, he testified that, when Ray found her new job, she told appellant that he "would be going with her."

Wesley testified that Ray and his father, Williams, had been divorced for many years, but they remained friends. He also testified that, at some point in July, Ray allowed Williams to stay at their house because Williams "had nowhere else to go." Appellant testified that, when appellant was married to Ray, Williams caused problems in appellant's relationship with Ray. He also testified that he and Ray maintained a sexual relationship after they divorced in 2010, but that Ray became "cold" and "distant" towards him when Williams moved in. Appellant's mother, Brenda Crofford, testified that appellant became "very upset" when Williams moved in. Wesley testified that about a week before the instant offense, appellant started coming to Ray's house in the early morning hours and "banging on windows and doors." When appellant did this, they "[i]gnored him until he left."

On July 15, appellant came to Ray's house to pick up Willow and Colten. Wesley testified

---

[1] Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

that appellant entered the house without knocking and argued with Ray. Appellant also walked past Williams twice and "hit him with his shoulder real hard." Ray and Williams asked appellant to leave, but he refused. Wesley testified that Williams and appellant "wound up getting into a fight" when appellant walked by Williams, stepped on his foot, and "put his shoulder in him" a third time. Appellant and Williams were "grabbing each other," and Wesley thought that Williams was choking appellant at one point. Appellant testified that Williams "grabbed [him] in the choke hold and choked [him] out." Eventually, Williams forced appellant outside and locked the door. Wesley testified that appellant then "acted like he was about to mess with [Williams'] truck," so Williams walked outside and told him to leave. Appellant got into his car and left. Williams thereafter left Ray's house and went to stay with his brother in Louisiana.

Appellant testified that he went home after fighting with Williams and called the police. Officer Randy Gray of the Greenville Police Department testified that he spoke with appellant at his home, and appellant declined to file charges. Gray testified that Ray had also called the police, but at her request no charges were filed.

Appellant testified that on July 16, he had a phone conversation with Ray in which he told her that he was going to kill himself. Ray called the police, and Officer Gray again went to appellant's house. Appellant testified that he knew that Ray had called the police after their phone conversation. He told Gray he was not really suicidal and he only said that to make Ray feel guilty. While Gray was at appellant's residence, he observed a black bag on the floor which contained a loaded sawed-off shotgun and ammunition.[2] Gray arrested appellant for possession of a prohibited

---

[2] Appellant testified that he sawed off his shotgun because he was angry at Williams and he planned "to go back and get him with it."

weapon. In the living room, Gray saw glass pipes commonly used to smoke methamphetamine. Appellant also had a small amount of marijuana in his pocket at the time of his arrest. Gray, however, did not charge appellant with possession of drugs or drug paraphernalia.

When appellant was released from jail on July 17, his neighbor, Loren Homerstead, asked him why the police had been at his house on the previous day. Homerstead testified that appellant told her that Ray called the police and had him arrested because she thought he was suicidal. Homerstead testified that she tried to calm appellant and reassure him that Ray would continue to let him see his children.

Appellant testified that he returned to Ray's house on July 19 to pick up Willow and Colten. He admitted that he used methamphetamines the previous night, but he denied drinking alcohol that day. Wesley, however, testified that appellant was "drunk" when he came to their house. Appellant testified that after he put Colten in his car, he argued with Ray "about when [Williams] was there in the past and [Ray] not doing anything to . . . stop [Williams] from choking [appellant]." Appellant testified that Ray said appellant was "too mad," and she removed Colten from his car. Appellant testified that while Ray was holding Colten, he "flicked her nose" twice, and then he got into his car and left. Appellant denied punching Ray in the eye, but Wesley testified that Ray and Colten "both had a black eye" after the incident.

Ray thereafter called the police and made a report of family violence.[3] Wesley testified that the police came to their house that night. Appellant, however, testified that he spoke to Ray later that

---

[3] Investigator Felicia White of the Greenville Police Department testified that, at the time of Ray's murder on July 20, there was a pending family-violence case in the system regarding the incident on July 19, with appellant listed as the perpetrator. She testified that part of the allegations involved injury to a child, Colten. White acknowledged that she did not contact appellant on July 20 about the family-violence incident because the case had not yet been assigned to her.

night and she did not tell him that she had called the police. Photographs from Ray's camera which depicted her face after the incident were introduced into evidence at trial.[4]

Appellant testified that he returned to Ray's house on the morning of July 20, and she let him come inside for about 20 minutes to see his children. After he left, he climbed a tree in an isolated field, where he drank alcohol most of the day and tried to get the courage to hang himself. He had been using methamphetamines and drinking alcohol and was agitated and paranoid because he had not slept in three days. He called and texted Ray throughout the day, but she did not respond. Ray's mother, Donna Ray, testified that appellant called her around 7:00 p.m. and said that he was looking for Ray and his children.

Appellant testified that, when he "ran out of alcohol," he returned to Ray's house. The door was unlocked, and no one was home. He went inside and took a basket containing marijuana and Ray's camera. He also took Wesley's shotgun from his room. He left Ray's house, stopped at a gas station to buy more alcohol, and returned home around 8:00 p.m. Appellant then sawed off Wesley's shotgun "so [appellant] could reach the trigger and still point it at [his own] head." He continued to call and text Ray, asking how their children were and what they were doing. Ray did not respond. Appellant then decided he would return to the tree and shoot himself. He testified that he saw Ray drive past his house as he was placing the shotgun in his car. He tried to call her again, but she did not answer. He testified, "I thought she was looking for me so I jumped in [my car] to chase her down, flag her down so I could ask her where the kids [were]."

Appellant testified that he was flashing his lights and driving next to Ray, asking her to roll

---

[4] The record contains black-and-white photocopies of these photographs, which are labeled State's Exhibits 93, 94, 95, and 96. These exhibits are of such quality that we are unable to precisely discern the extent of Ray's alleged injuries.

down her window and tell him where their children were. When they eventually stopped, appellant pulled his car next to hers and saw that she was talking on the phone. He testified that he felt "[h]urt and angry" because she had her phone and was not answering his calls. Appellant had his window down and was yelling at Ray when he saw a police car behind him with its lights on. At that point, he "stuck the shotgun out the window and pulled the trigger," deliberately aiming for Ray's head. He denied that he shot Ray because she called the police. He testified he "lost [his] mind" because he was angry that Ray had not responded to his calls and texts asking about his children. He testified that he did not know that Willow and Colten were in the back seat of Ray's car when he shot her because her car windows were tinted and he did not have a clear view into the vehicle. As he drove away after shooting Ray, appellant assumed that she was fatally wounded because he observed in his rearview mirror that her car "started rolling forward." On cross-examination, appellant acknowledged that he believed it was Ray's fault that he shot her. He explained that Ray "pushed [him] to a limit to where [he] took her life[.]"

The evidence showed that Ray was making a 9-1-1 call when she was shot. Heather Doty, a dispatcher for the Greenville Police Department, testified that she received Ray's call around 10:20 p.m. A recording of the call was admitted into evidence and played for the jury. During the call, Ray reported that her ex-husband was following her down Sayle Street, flashing his lights at her and trying to get her to pull over, and that she was afraid that he was going to run into her car. She said that she had been "driving around . . . looking for [her] son" when she saw appellant "in the neighborhood," and he started following her.[5] She explained that appellant had been harassing her and that she had already filed a police report against him when he punched her in the eye the

---

[5] Wesley testified that on the night of the offense, he had left his home to go bike riding with friends.

previous night. She stated, "I told him I was calling the police. So he knows I'm talking to ya'll." At one point during the call, Ray said that appellant had "cornered [her] in" and was yelling, "Where are the kids." Doty heard children in the car, and she told Ray that a police officer was on the way. When Doty asked Ray if she saw an officer, Ray responded, "Yeah, there's lights."

Officer Gregory Hughes responded to the scene and pulled up behind two vehicles parked parallel to each other in the north lane on Sayle Street. Ray's car was next to the curb, and appellant's car was on her driver's side. Hughes heard a gunshot, then appellant drove away and Ray's car "began to roll." Ray's car veered to the right and ran into the curb. When Hughes exited his car and approached Ray's vehicle, he "found a bullet hole through the driver's window and the driver was shot." The doors were locked, and two small children were in the back seat. Another officer who arrived at the scene pushed through the broken side window so they could unlock the doors. Hughes testified that Ray was unresponsive and appeared to have "a bullet wound in the head." Howard Roberson, a passerby who had witnessed appellant driving away from the scene, obtained appellant's license-plate number and gave it to Hughes. Ray died at the scene. The medical examiner testified that Ray's cause of death was "a shotgun wound to the head." The shot entered her left cheek and exited "on the back of the right [side of the] head."

Appellant testified that after he left the scene, he called Ray's mother, Donna, and said: "I just shot [Ray] in the head, she's dead, you shouldn't have lied to me about my kids." Appellant also texted Homerstead: "I shot her in head bitch is dead TOLD her not to fuck with my kids."[6] He called Williams and left him a voicemail stating "she's dead" and, "I shot her in the head, which is what

---

[6] Homerstead testified that she called the police after receiving appellant's text message. When questioned by the prosecutor, she acknowledged that she also told police that appellant said, "It's true I did it, I'm not dead yet, going to go, DPS are all over me."

I had intended for you." He added, "I'll probably be dead soon. Otherwise, you're a dead man." He also left Williams a second voicemail in which he threatened Williams and his brothers. Donna testified that appellant called her again later that night and said, "See, I told you."

Appellant testified that he also called his mother, Crofford, and told her that he had shot Ray. In an interview with Investigator Felicia White of the Greenville Police Department, Crofford recounted what appellant told her about what had happened before the shooting. According to Crofford, appellant said that Ray told him, "Micah, I'm calling the police." Appellant said that he told Ray, "I know you are," and "I see the police."

Appellant testified that he backed his car into a grove of trees, where he hid for a few hours. He then knocked out his headlights and drove on Highway 69 until he ran out of gasoline. He went to a house and asked for gasoline, then he "took off on foot" when that proved unsuccessful. He put on a vest and brought his flashlight, shotgun, ammunition, and pocket knives, which were items he thought he needed to "survive in the wilderness." Officer Perry Sandlin testified that appellant's abandoned car was located on County Road 1033 at 3:30 or 4:00 a.m. on July 21, with an empty shotgun-shell box on the ground nearby. Investigator White testified that Ray's camera, which contained the photographs that Ray took on July 19, was recovered from the back seat of appellant's car.[7]

Appellant testified that he walked along some railroad tracks, where he lost his cell phone. When he heard helicopters, he got into a pond to avoid "being located by the infrared." He came upon a vacant house and hid in it for a while. Eventually, he went "next door" to Cactus Saddlery,

---

[7] In her interview with White, Crofford said that appellant told her that "he had [Ray's] camera" in his vehicle and "was looking at the pictures."

a business located about five to six miles north of Greenville on Highway 69.

Cactus Saddlery employee Efrain Girardot testified that he encountered appellant outside the building at around 6:00 a.m. on July 21. Appellant walked towards Girardot carrying a shotgun and a knife, and he asked him for water and to use the phone. Girardot told appellant to put his weapons down, and appellant laid them on the ground in the parking lot. When they went inside the building, Girardot offered appellant water and let him use the phone in his office. Girardot testified that appellant called his mother and told her that he was tired and he wanted her to pick him up. Another employee, Gary Magennis, called the police when Girardot made him aware that appellant had a gun. Girardot went outside with appellant and sat with him while appellant smoked a cigarette. Meanwhile, Magennis picked up appellant's weapons and ran towards the SWAT team that had arrived at the front gate. Appellant then walked towards the SWAT team with his hands up. He complied when he was told to get on the ground, and he was handcuffed and taken into custody.

Investigators White and Jamie Fuller conducted a videotaped interview of appellant at the Greenville Police Department on July 21. Appellant told them that, before the offense, he had unsuccessfully called Ray to ask about his children. He saw Ray drive by his house, so he "jumped in [his] truck and tried to stop her and chase her down," but "she wouldn't stop." He stated, "And, obviously, I could tell she called–was up with the police on the phone." When he "finally got [Ray] to pull over," he asked her to roll down her window and tell him where the children were. He stated, "[S]he didn't do it. And I saw the police lights pulling up behind me, so I just–I shot her." Appellant said that he was angry at Ray because she planned to move away with the children, allowed Williams to stay at her house, and failed to stop Williams from fighting with him and choking him. He explained, "There's a number of things like that that added up," and "I lost it."

While questioning appellant about his actions after the shooting, White asked, "Was there any point in time where you planned on killing yourself or having the cops shoot you or shoot at them?" Appellant answered that he "was going to fire, like, a warning shot just to, I guess, [commit] suicide by cop."

While in jail on July 22, appellant agreed to be interviewed by a reporter from a news station in the Dallas/Fort Worth area. During the televised interview, appellant admitted that he murdered Ray because he "wanted her dead." He stated that when he was following Ray and trying to get her to stop, "she was on the phone" and he "figured it was with the police." He added:

> I finally got her to pull over, just trying to convince her, just tell me where are my kids, and she never would say. I saw the police and then the lights in my rearview mirror, so I just pulled the gun -- gun out and shot her . . . It was kinda -- it was just spur of the moment. I always told her, you know, if anybody ever tries to come between me and my kids, that I would kill someone over that. I didn't do anything to deserve her not to tell me where they are or anything, and I meant it when I said it. I just got so mad that I did it.

When the reporter asked appellant if he knew his children were in the back seat, he said that he looked but did not see them. He said, "I would have never done that in front of them." The reporter asked, "So you regret that you killed her in front of your kids, but you don't regret that you killed her[?]" Appellant answered, "No."

Appellant told the reporter that "a lot of things built up inside of [him]," like the fact that Ray let Williams stay with her, she did nothing to stop Williams from choking appellant, and she planned to move away with their children on "August 1st." He stated, "It just drove me crazy, I guess, not being able to see my kids." When appellant acknowledged that he had been suicidal, the reporter asked him why he felt that way. Appellant answered:

> I've been suicidal in the past. And the only two things that, you know, I'm still here is my kids and they're about to be taken away from me.

The other -- the other problem, I want to say was I wanted to go hunting and she called the police on me saying I was suicidal. And they came in the house and they found a sawed off shotgun. So that's a felony. So I can't -- I wasn't able to go hunting anymore.

Anyways, I can't be around my kids. I can't do -- I mean, the two things -- the reason I was stripped away from me and --

The reporter later asked appellant, "Is there anything else you want to say?" Appellant added:

And then, like I said, I guess I just -- I went crazy. I couldn't stand the fact of, you know, only being able to see my kids four days a month. And [I] just don't know how it went from calling the cops on me and this and that from she was going to take me with her if she found -- when she found a job and moved off.

Appellant also described his involvement in the offense and demonstrated a lack of remorse in a letter he wrote to a fellow jail inmate. Appellant testified that "Casper" was an inmate in a neighboring cell who asked him what happened. In the letter, appellant recited in part that Ray was moving away, that she let Williams move in, that he and Williams fought, that he felt suicidal, and that Ray stopped answering his calls. With regard to the instant offense, he explained:

I chased her down and made her pull over. She wouldn't look at me and she was on the phone. I knew it was the cops and for some reason when I saw the red and blues behind me I put the shot gun [sic] out the window and blew her head off. <u>Clean</u> off.

He stated in the letter, "I still don't regret it one bit." He added, "To be honest, I would do the same to [Williams] if I had the chance." Appellant also instructed Casper to "flush" the letter after reading it.

At the punishment phase of his trial, appellant presented evidence that he had a history of using alcohol and drugs, including marijuana, cocaine, methamphetamines, and "pain pills." He once lost a job due to a failed drug test, and he continued to use drugs after participating in rehabilitation programs. His parents divorced when he was young, and his mother later married an emotionally abusive man who sexually abused appellant's sister. Appellant reported that he was

sexually molested by his stepbrother at age 12. He had been suicidal at times, and he reported a family history of substance abuse, depression, and anxiety.

Defense expert Dr. Paula Lundberg-Love testified that sleep deprivation and drug use could lead a person to act impulsively without thinking of the consequences of his actions. She opined that "the duration of [appellant's] drug-taking compromised the ability of his brain to work in a functional manner." She noted that appellant "did not commit violent behavior before he was taking methamphetamine and cocaine," and there was a lower probability that he would be violent if he were no longer taking those drugs.

Defense expert Dr. Mark Cunningham also testified that appellant had a history of drug use and impulsive behavior. As a child, appellant was socially immature and had an inability to focus in the classroom. Cunningham testified that these behaviors were "consistent with attention deficit hyperactivity disorder of the non-hyperactive type." Cunningham opined that "there is a very low likelihood that [appellant] would exhibit serious violence [if] confined for life in the Texas prison system."

Appellant also presented the testimony of Morris Beene and Jason Hammock, two ministers who had been visiting him in jail. They both testified that they believed appellant felt remorse for killing Ray. However, on cross-examination, they were both surprised to hear from the prosecutor that appellant testified he believed it was Ray's fault that he killed her. Hunt County Sheriff Randy Meeks and other sheriff's department employees testified that appellant behaved well in jail and was a model inmate. Meeks acknowledged that appellant had an incentive to behave, was housed in a single cell by himself most of the time, and had extra security measures to ensure his safety. On rebuttal, the State played a clip from a recorded phone conversation while appellant was in jail. In

the clip, appellant said jail was like "Starbucks" because you could "drink coffee and read all day."

SUFFICIENCY OF THE EVIDENCE

In point of error six, appellant claims that the evidence is legally insufficient to support his conviction. When reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict to determine whether, based on that evidence and the reasonable inferences therefrom, a jury was rationally justified in finding guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.

The charge authorized the jury to convict appellant of capital murder if it found that he intentionally murdered Ray in the course of committing or attempting to commit obstruction or retaliation, or terroristic threat. *See* TEX. PENAL CODE § 19.03(a)(2). With regard to the offense of obstruction or retaliation, Section 36.06 of the Texas Penal Code provides:

(a) A person commits an offense if he intentionally or knowingly harms or threatens to harm another by an unlawful act:

(1) in retaliation for or on account of the service or status of another as a:

(A) public servant, witness, prospective witness, or informant; or

(B) person who has reported or who the actor knows intends to report the occurrence of a crime; or

(2) to prevent or delay the service of another as a:

(A) public servant, witness, prospective witness, or informant; or

(B) person who has reported or who the actor knows intends to report the occurrence of a crime.

TEX. PENAL CODE § 36.06 (a).

Appellant claims that the evidence was insufficient to prove the underlying offense of obstruction or retaliation. Appellant admits that he intentionally shot and killed Ray, but he disputes the reason why he did it. He contends that "there are other possible and more probable reasons why [he] killed his ex-wife." For example, he was upset and angry that she: was moving away with his children; let Williams move in with her; did not intervene when Williams "choke[d] him out in front of his kids"; "recently refused to let him see his kids"; and refused to let him know where his children were on the day that he shot her. He contends that due to a "combination of these factors," he "just lost it" and made a "spur of the moment" decision to shoot Ray.

Appellant was aware that Ray called the police on July 16 when he threatened to commit suicide, which led to his arrest for possession of a prohibited weapon. He told Homerstead that Ray had him arrested because she thought he was suicidal. Appellant contends that "the evidence demonstrated that he harbored no animus against [Ray] for her role in his arrest for possession of a prohibited weapon." However, he complained to the reporter in the televised news interview that he "wasn't able to go hunting anymore" because the police came to his house in response to Ray's call and "found a sawed off shotgun."

Appellant claims that he did not know Ray called the police to report the family violence incident that occurred on July 19. However, he acknowledged that he took her camera, which contained photographs of her face following that incident. And appellant admittedly knew that Ray was calling the police when he was chasing her in his car on July 20. Ray reported to the dispatcher that appellant was following her and harassing her, that she was afraid he was going to run into her car, and that at one point he "cornered [her] in." Ray also informed the dispatcher that appellant

knew she was calling the police. In his phone conversation with Crofford, his interview with White and Fuller, his interview with a television news reporter, and his letter to "Casper," appellant confirmed that he knew Ray called the police. He also admitted that he saw a police officer pulling up behind him before he shot Ray. The jury could have rationally concluded based on this evidence that appellant murdered Ray in retaliation for calling the police on July 20, or to prevent her from saying anything further to police about the events that transpired on or before July 20.

Although there may have been several reasons why appellant wanted to kill Ray, the evidence viewed in the light most favorable to the verdict was sufficient for the jury to rationally conclude that appellant intentionally murdered Ray in the course of committing or attempting to commit obstruction or retaliation.[8] Point of error six is overruled.

In point of error three, appellant asserts that the evidence is legally insufficient to support the jury's affirmative answer to the future-dangerousness special issue. Appellant argues that he does not pose a future danger to society because there is "no evidence that [he] preplanned the murder" and he "only shot his gun [at the victim] once." He contends that he has no prior convictions or history of violence and that he "has repeatedly expressed sincere remorse" for his actions. He emphasizes Cunningham's testimony that there is a very low likelihood that he will commit serious violence if he is confined in prison for life. He also adds that character witnesses testified that he was a good father and that he counseled others while in prison and developed a "sincere relationship with the Lord."

---

[8] Appellant also claims that the evidence was insufficient to prove terroristic threat, but we need not address that issue since we hold that the evidence was sufficient to prove the underlying offense of obstruction or retaliation. *See Cardenas v. State*, 30 S.W.3d 384, 391 (Tex. Crim. App. 2000) (proof of only one of the underlying felonies is required to support a defendant's conviction).

When reviewing the legal sufficiency of the evidence to support the jury's answer to the future-dangerousness special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have believed beyond a reasonable doubt there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. *Williams v. State*, 273 S.W.3d 200, 213 (Tex. Crim. App. 2008); *Jackson*, 443 U.S. at 319. In its determination of this special issue, the jury is entitled to consider all of the evidence admitted at both the guilt and punishment phases of trial. *Young v. State*, 283 S.W.3d 854, 863 (Tex. Crim. App. 2009). The jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). The circumstances of the offense and the events surrounding it may be sufficient to sustain an affirmative answer to this special issue. *Devoe v. State*, 354 S.W.3d 457, 462 (Tex. Crim. App. 2011); *King v. State*, 953 S.W.2d 266, 272 (Tex. Crim. App. 1997).

The evidence shows that appellant had an escalating pattern of violence and disrespect for the law prior to killing Ray. *See Jackson v. State*, 33 S.W.3d 828, 838 (Tex. Crim. App. 2000) (Johnson, J., concurring, citing *King v. State*, 953 S.W.2d 266, 271) (an escalating pattern of disrespect for the law supports a finding of future dangerousness). In the days leading up to the murder, appellant got into physical altercations with both Williams and Ray. He admitted that he sawed off his shotgun because he planned "to go back and get [Williams] with it." When police confiscated that gun, appellant stole Wesley's shotgun and sawed it off. He also stole Ray's camera, which contained photographic evidence of their physical altercation on July 19. He chased Ray in his car, forced her to pull over, and "blew her head off" with Wesley's shotgun while their two small children were in the back seat of Ray's car. He intentionally killed Ray despite knowing that she had

called the police and seeing a police car behind him. After committing this crime, hefled the scene and attempted to evade capture by the police . *See Smith v. State*, 74 S.W.3d 868, 872 (Tex. Crim. App. 2002) (such actions reflect a disregard for the lives of pursuers and innocent bystanders).

Appellant also demonstrated a lack of remorse for murdering Ray. *See Rachal v. State*, 917 S.W.2d 799, 806 (Tex. Crim. App. 1996) (lack of remorse as a factor in determining future dangerousness); *Trevino v. State*, 991 S.W.2d 849, 854 (Tex. Crim. App. 1999) (future dangerousness can be inferred from evidence showing a lack of remorse). Shortly after committing the offense, appellant called Williams and Donna to brag and taunt them about killing Ray. He left Williams voicemails threatening to kill him and his brothers. He also sent Homerstead a text bragging that he "shot [Ray] in [the] head" and the "bitch is dead." He later affirmed to both a television news reporter and fellow inmate Casper that he did not regret killing Ray. He expressed a continued desire to kill Williams in his letter to Casper. He also continued to blame Ray for her own death when he testified at trial.

Appellant points out that he has displayed good behavior while incarcerated. While good behavior in prison is a factor to consider, it does not preclude a finding of future dangerousness. *Devoe,* 354 S.W.3d at 468. The evidence, viewed in the light most favorable to the verdict, was sufficient to support the jury's affirmative answer to the future dangerousness special issue. Point of error three is overruled.

## ADMISSION OF LETTER

In point of error four, appellant contends that the trial court abused its discretion in admitting into evidence State's Exhibit 86, the letter that appellant wrote to fellow inmate Casper. Appellant argues that the letter was not properly authenticated—and therefore was inadmissible—because it

"was not found near [him] or in his possession," it "did not contain any signature or other reference to its author," and there was no evidence that his fingerprints were found on it.

The admissibility of evidence is a preliminary question to be decided by the trial court. Tex. R. Evid. 104(a). Relevant evidence is generally admissible at trial. Tex. R. Evid. 402. However, evidence has no relevance if it is not authentically what its proponent claims it to be. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). At the time of the offense, Texas Rule of Evidence 901(a) stated that "authentication . . . as a condition precedent to admissibility of evidence that requires the proponent to make a threshold showing that is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id*; Tex. R. Evid. 901(a) (1998). Whether the proponent has crossed this threshold as required by Rule 901 is one of the preliminary questions of admissibility contemplated by Rule 104(a). *Tienda*, 358 S.W.3d at 638, *citing Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

The trial court should admit proffered evidence "upon, or subject to the introduction of evidence sufficient to support a finding of" authenticity. *Id.* The trial court need not be persuaded that the proffered evidence is authentic. *Id.* The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a determination by a reasonable jury that the proffered evidence is authentic. *Id.* Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence. *Id.*

A trial court's ruling on the preliminary question of admissibility is subject to an abuse of discretion standard of review. *Id.* We will affirm the trial court's decision as long as the ruling is within the zone of reasonable disagreement. *Druery*, 225 S.W.3d at 502.

The State introduced the letter during the testimony of Investigator Felicia White.  On direct examination by the prosecutor, White testified:

> Q.      Did you also receive a copy of a letter from the jail related to the Defendant?
>
> A.      I did.
>
> Q.      How did you receive this copy?
>
> A.      I believe I got it from Tommy Grandfield, and I -- they had got it from an inmate or something.[9]
>
> Q.      Is it routine for the sheriff's department to bring you copies of things that they find over in someone's cell if they think they're related to your case?
>
> A.      Correct.
>
> *               *               *
>
> Q.      Did you review the document to see if it contained facts or details about this case that you -- that would have been known to the Defendant?
>
> A.      Yes.
>
> Q.      And did you find some?
>
> A.      I did.

Defense counsel then objected that there was not "a proper predicate" for the admission of the letter.  The prosecutor asked White if the letter contained specific details which led her to believe that appellant was the author, and White replied that it did.  White acknowledged that the letter referred to Tracy Williams and included specific details about the crime and escape.  On voir dire examination by defense counsel, White agreed that she did not have personal knowledge of who

---

[9]   The prosecutor did not ask, nor did White explain, who Tommy Grandfield was.  However, on voir dire examination by defense counsel, White acknowledged that the letter was given to her by "someone from the sheriff's office."

wrote the letter, but she added, "I think I know who."

On direct examination by the prosecutor, White listed the specific details contained in the letter that would have been known to appellant:

Q.      Contained within this document, did you find specific references to Tracy Williams?

A.      Yes.

Q.      Did you also find specific references to Tracy Williams moving to Shreveport?

A.      Yes.

*               *               *

Q.      And in the letter you found a reference to a 3-year-old son?

A.      Correct.

Q.      Did you also find [a] reference to the ex-wife moving to Kilgore?

A.      Yes.

Q.      Did you also find [a] reference or statements in here believing [sic] that not only was the ex-wife moving to Kilgore but that she was looking for a job for Tracy in Kilgore?

A.      Correct.

Q.      Did you find a -- references to whether or not the individual who wrote this had slept for several days?

A.      Yeah.

Q.      Did the individual who wrote this also say that he had been choked out by Tracy?

A.      Uh-huh.  That's correct.  Right here (indicating), and he was whipped in front of his kids.

Q.      Did the individual who wrote this specifically address taking a

shotgun, chasing Stella, and blowing her head off?

A.      Yes.

Following White's testimony, the trial court admitted the letter into evidence.  When appellant later testified at trial, he admitted that he wrote the letter.

The trial court did not abuse its discretion in admitting the letter.  White supplied facts that were sufficient to support a determination by a reasonable jury that appellant wrote the letter.  As the State points out in its brief, the letter contained details that appellant did not disclose in his televised news interview.  For example, appellant mentioned Ray's ex-husband in the interview, but he did not identify him by name.  And appellant mentioned in the interview that Ray planned to move, but he did not state that she planned to move to Kilgore with Williams.  In light of White's testimony, the trial court's admission of the letter was within the zone of reasonable disagreement.  *See Druery*, 225 S.W.3d at 502.  Point of error four is overruled.

ADMISSION OF PHOTOGRAPHS

In point of error five, appellant complains that the trial court erred in admitting into evidence three autopsy photographs labeled State's Exhibits 263, 268, and 269.  Appellant argues that these photographs were inadmissible because their prejudicial nature substantially outweighed their probative value.  TEX. R. EVID. 403.

The admissibility of a photograph is within the sound discretion of the trial judge.  *Young,* 283 S.W.3d at 875.  The trial court's decision may be disturbed on appeal only when it falls outside the zone of reasonable disagreement.  *Id.* at 874.  When determining whether the trial court erred in admitting relevant photographs into evidence, our review is limited to determining whether the probative value of the photographs is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. *Id.;* TEX. R. EVID. 403. A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. *Id.* These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black and white, whether they are close-up, and whether the body depicted is clothed or naked. *Id.* Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

Medical examiner Chester Gwin testified that multiple photographs were taken during Ray's autopsy. Gwin chose five of twenty photographs that he believed were necessary to explain the injuries described in his autopsy findings.[10] When the State offered these photographs into evidence, defense counsel objected that State's Exhibits 263, 268, and 269 were "inflammatory" and "unnecessary to determine whether or not this lady is dead." The trial court admitted the photographs over defense counsel's objection.

The exhibits at issue are displayed in the appellate record as 8 x 10 inches and black-and-white. State's Exhibit 263 is a close-up photograph which depicts the shotgun entrance wound on Ray's left cheek. As Gwin testified, it shows "some radiating lacerations that come out from that wound," and several "red punctate abrasions," or "pseudo-stippling," on the left side of Ray's face. Gwin testified that this photograph was "consistent with the story" that the shot traveled through the driver's side window, shattered the glass, and caused glass fragments to become

---

[10] State's Exhibits 263, 268, 269, 278, and 280 were admitted into evidence before the jury. The remaining autopsy photographs were admitted for appellate purposes only, without objection. Appellant does not complain about the admission of State's Exhibits 278 and 280 on direct appeal.

"secondary projectiles" which caused "punctate abrasions on the skin."

State's Exhibit 268 is a close-up photograph which depicts the exit wound on the back of Ray's head. State's Exhibit 269 is a close-up photograph which, as Gwin testified, depicts a "broad area of pseudo-stippling" on Ray's upper left arm and shoulder.

The exhibits at issue portray no more than the gruesomeness of the injuries inflicted by appellant. *See Narvaiz v. State*, 840 S.W.2d 415, 429-30 (Tex. Crim. App. 1992). The probative value of this evidence is not substantially outweighed by the danger of unfair prejudice. *See id.* The trial court's decision to admit this evidence was within the zone of reasonable disagreement and was not an abuse of discretion. Point of error five is overruled.

## MITIGATING EVIDENCE

In point of error one, appellant asserts that the State's closing argument at punishment "deprived appellant of a vehicle to permit the jury to give a reasoned moral response to appellant's mitigation evidence." In point of error two, appellant argues that "the trial court's charge coupled with the prosecution's punishment phase jury arguments improperly required a nexus between appellant's mitigating evidence and the criminal act for which he was convicted."

Regarding the punishment charge, appellant specifically complains about the following jury instruction: "In deliberating on Special Issue Number 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Appellant contends that this statutory definition of mitigating evidence improperly requires a nexus between the crime and the mitigating evidence. We have previously held that we do not see any "nexus" requirement in the statutory definition of mitigating evidence. *Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010). Further, we have held that it is not reasonably likely that a jury

would infer a nexus requirement from the statutory language. *Id.*

In order to assess the death penalty, the jury must be provided a vehicle by which to fully consider and give effect to mitigating evidence. *Ex parte Smith*, 309 S.W.3d 53 55 (Tex. Crim. App. 2010). Appellant asserts that a jury may be improperly precluded from giving full consideration and effect to a defendant's mitigating evidence "not only as a result of the instructions given, but also as a result of prosecutorial argument dictating that such consideration is forbidden." *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n.21 (2007). Here, appellant contends that "the prosecutor's continuous and impermissible remarks erected a barrier to full consideration of mitigating proof about [a]ppellant's background."

Permissible jury argument generally falls into one of four areas: (1) a summation of the evidence; (2) a reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). Improper jury argument will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violates a mandatory statute, or injects into the trial proceeding new facts harmful to the accused. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial. *Id.* In most instances, an instruction to disregard the remarks will cure the error. *Id.*

During his closing argument, the prosecutor explained to the jury that "Special Issue No. 2" asks "whether taking into consideration all of the evidence . . . including the circumstances of the offense, the Defendant's character and background and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence

of life imprisonment rather than a death sentence be imposed." Appellant first challenges the following portion of the prosecutor's argument, in which he discussed appellant's character and background:

> The business about the family tree, I'm sorry, you decide this but you take that family tree and you just take a dry eraser and you erase every name from that family tree and then plug in whoever you want. Plug in anybody's family. You plug in your own family perhaps. There is not one among us who within our family don't have the alcoholics, don't have the individuals who have bad marriages, possibly have been married several times, possibly abuse within the family, possibly sexual abuse within the family. There is nothing -- it's sad, don't get me wrong, it is a sad affair that occurs to any family. But there's nothing special about it insofar as that it was sufficient to cause the Defendant to commit this offense. It's not sufficient to prove that he's not a future danger and it's not sufficient as a mitigating circumstance to justify life without parole. It's just not.
>
> *          *          *
>
> I want you to think about that carefully. Sufficient is a keyword and the reason it's key is because it has to be sufficient. It can't just be mitigating. It has to be sufficient mitigating evidence.
>
> There's -- if you go through the last one on Special Issue No. 2, the personal, moral culpability of the Defendant. And that is huge . . . The personal . . . not all the family tree, not everything else, the personal moral culpability or blameworthiness of the Defendant. And can you think of any offense that is any more blameworthy on this Defendant than this offense[?] He intended to kill Stella. He wanted her dead.

Appellant, however, failed to preserve error with regard to this portion of the prosecutor's argument because he failed to object to it. Tex. R. App. P. 33.1.

The prosecutor later stated that there was "a laundry list" of factors that were aggravating as opposed to mitigating, including appellant's letter to Casper, the fact that he had "extra ammo . . . when he was running from the police," his plan to commit "suicide by cop," and the fact that he used Wesley's gun to kill Ray. The prosecutor then focused on appellant's drug use:

> The drug use -- and I want to mention the drug use. Drug use is not

mitigating. You heard a ton of evidence about testimony that it was tied into a mitigating factor --

[DEFENSE COUNSEL]: Your Honor, I'm going to object. He is saying drug use is not mitigation. He cannot tell this jury what is or is not mitigation. That is an error. It is for the jury to decide in their mind what is or is not mitigation and he cannot tell them what it is.

THE COURT: Sustained.

[DEFENSE COUNSEL]: I'd ask for an instruction to the jury, Your Honor.

THE COURT: All right. The jury will be instructed that you and you alone decide what is mitigating or aggravating in this case.

Defense counsel also moved for a mistrial, which the trial court denied.

Appellant presented evidence of his drug use as a mitigating factor through the testimony of defense expert witnesses Lundberg-Love and Cunningham. The prosecutor argued that the jury should instead view appellant's drug use as an aggravating factor. "[N]either the state nor federal constitution requires that certain evidence be labeled as mitigating, nor does it require what weight, if any, should be given to evidence that is found to be mitigating." *Cantu v. State*, 939 S.W.2d 627, 640 (Tex. Crim. App. 1997). Here, the trial court sustained appellant's objection and reminded the jury that it alone would decide whether the evidence was or was not aggravating or mitigating.[11] However, even if we assume error, the trial court's instruction was sufficient to cure it. *See Wesbrook*, 29 S.W.3d at 115.

Appellant next complains about the rebuttal portion of the prosecutor's closing argument, which occurred after defense counsel asked the jury to "render the deeds of mercy" to appellant when

[11] Notably, the prosecutor said in her opening statement at punishment: "We can't tell you what's mitigating and aggravating, right? You guys are going to decide that for yourselves. I expect you're going to hear a lot of testimony about drugs during this trial."

deciding the special issues. The prosecutor responded that "mercy is given by God to those who show true repentance," and that appellant had not done so. The prosecutor stated that appellant's murder of Ray was "a true reflection of lack of mercy," and then continued:

> [PROSECUTOR]: Who do we give life without parole to in a capital murder case? A defendant who throws himself at the mercy of the jury.

> [DEFENSE COUNSEL]: Objection, Your Honor, that is not the standard and she is misstating the law.

> [PROSECUTOR]: Your Honor, she argued who should and should not get it [and] I think I should be able to argue against it.

> THE COURT: Overruled.

> [PROSECUTOR]: A defendant throws himself on his face in front of the jury and said I did it all, forgive me. It's my fault.

> [DEFENSE COUNSEL]: Objection, Your Honor, that is not the standard. The standard is the two special issues. That is how you decide.

> THE COURT: Ladies and gentlemen of the jury, you are the ones that decide the issues. And again, whatever the attorneys say is not evidence. It's argument.

The prosecutor's argument about mercy was a permissible answer to the argument of opposing counsel. Defense counsel pleaded for the jury's mercy in closing argument, and the prosecutor properly argued against it.

Finally, appellant complains about the following statements made by the prosecutor toward the end of closing argument:

> So as you go back in the jury room and you deliberate, ask yourselves a couple of questions. One of them, anywhere in this jury charge does it say do I feel sorry for the Defendant[?] Is that one of the questions we're asking you? Does it say anywhere in there that sympathy for the Defendant is part of your deliberations? I mean, I'm asking you. It doesn't say that in the charge. It says holding him responsible or it says considering his actions is important, considering what he did, considering the circumstances of the offense, considering the effects of what he's done, those are all in that charge. And that's what we're asking you to do.

> If you guys follow the law, this answer will not be easy because it's not an easy question. It will not be easy.

Because appellant failed to object to this portion of the prosecutor's argument, he has forfeited his right to complain about it on appeal. TEX. R. APP. P. 33.1. However, we note that evidence that depends on mere sympathy or an emotional response should not be considered in the jury's determination of the defendant's deathworthiness. *Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012), *cert. denied*, 134 S. Ct. 823 (2013).

When mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury can consider and give effect to the mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime. *Cantu*, 939 S.W.2d at 641. Neither the trial court's instructions nor the prosecutor's arguments deprived the jury of a vehicle by which to consider and give effect to the mitigating evidence, nor did they require a nexus between the crime and the mitigating evidence. Points of error one and two are overruled.

We affirm the judgment of the trial court.


Delivered: September 16, 2015
Do not publish