**Charles Edward SMITH, Appellant,**

**v.**

**The STATE of Texas.**

Court of Criminal Appeals of Texas.

May 8, 2002.

Woody Leverett, Midland, for Appellant.

Ori T. White, District Attorney, Fort Stockton, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the unanimous Court.

In August 1989, a Pecos County jury found the appellant guilty of capital murder and answered the punishment issues in a manner requiring the imposition of the death penalty. We reversed the conviction. *Smith v. State,* No. 71, 010 (Tex. Crim.App. December 4, 1991) (not designated for publication). The appellant was again convicted of capital murder and received the death penalty. We affirmed the conviction but reversed the death sentence and remanded the case for a new punishment hearing. *Smith v. State,* 907 S.W.2d 522, 534 (Tex.Crim.App.1995). Now we consider the appellant's third trial on punishment conducted in November 1999, in which the jury answered three special issues pursuant to Article 37.0711, sections 3(b) and 3(e), and the trial court again sentenced the appellant to death. TEX. CODE CRIM. PROC. art. 37.0711 § 3(g).[1] Di-

---

1. Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.

rect appeal to this Court is automatic. Art. 37.0711 § 3(j). The appellant raises five points of error. We will affirm.

■ In his first point of error, the appellant challenges the legal sufficiency of the evidence to support the future dangerousness issue. In evaluating the sufficiency of the evidence to support the jury's answer to the future dangerousness special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence constituting a continuing threat to society. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Allridge v. State,* 850 S.W.2d 471, 487 (Tex.Crim.App.1991). We have enumerated a non-exclusive list of factors that the jury may consider in determining whether a defendant constitutes a continuing threat to society:

(1) the circumstances of the capital offense, including the defendant's state of mind and whether he was acting alone or with other parties;

(2) the calculated nature of the defendant's acts;

(3) the forethought and deliberateness exhibited by the crime's execution;

(4) the existence of a prior criminal record and the severity of the prior crimes;

(5) the defendant's age and personal circumstances at the time of the offense;

(6) whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

(7) psychiatric evidence; and

(8) character evidence.

*Keeton v. State,* 724 S.W.2d 58, 61 (Tex. Crim.App.1987); *accord Reese v. State,* 33 S.W.3d 238, 245 (Tex.Crim.App.2000). In the appropriate case, the circumstances of the offense alone may warrant an affirmative answer to the future dangerousness special issue. *Sonnier v. State,* 913 S.W.2d 511, 517 (Tex.Crim.App.1995).

■ Here, the State presented evidence of the facts surrounding the capital murder. After escaping from a Kansas correctional facility in August 1988, the appellant and his cousin stole a truck and drove to the Houston area where they burglarized several homes and stole, among other things, a .357 magnum pistol and ammunition. They then stole a van and began driving west toward New Mexico. On August 19, 1988, the appellant and his cousin drove away from a gas station in Bakersfield, Texas, without paying for gas. Officer Tim Hudson and two other patrol cars responded to the theft call and engaged the appellant and his cousin in a car chase, which ended with the appellant firing three shots at Hudson's car, one of which fatally wounded Hudson.[2] Hudson had momentarily driven along side of the appellant and had not unstrapped his gun holster or rolled down his car window.

The appellant and his cousin continued to evade police. While unsuccessfully trying to steal a pick-up truck, the appellant and his cousin stole a .22 rifle and ammunition. They eventually stopped at a local farm where they were able to steal a tractor-trailer and set the van on fire. The appellant and his cousin then encountered a police road block, did a U-turn in the road, and another high speed chase ensued. Several branches of law enforcement, including a helicopter from the Unit-

---

**2.** The appellant's cousin handed the appellant the gun, but did not tell the appellant to shoot Hudson. Furthermore, in his confession, the appellant stated that he was not afraid or under the domination of his cousin.

ed States Customs Service, participated. The chase exceeded speeds of 100 miles per hour and involved shots fired both at and from the stolen tractor-trailer. The appellant eventually drove the tractor-trailer off the road and was apprehended. He later confessed to the entire incident.

The State also presented testimony concerning the appellant's behavior in Kansas and in the Pecos County Jail. In Kansas, the appellant and some friends tried to pick up several girls that they saw at a store, but the girls were not interested. The appellant and his friends followed the girls home and again unsuccessfully tried to pick them up; the encounter eventually devolved into an exchange of obscenities. The girls' brothers heard the cursing and came outside. The appellant and his friends cursed and threw lit firecrackers at them before driving away. The appellant and his friends returned shortly thereafter and slowly drove around the home several times. The police were called and a report was made. Less than an hour after the police left, however, the appellant and his friends returned. The girls' brothers jumped in their car and a chase ensued. The appellant and his friends came to a stop. The brothers exited with sticks in their hands and approached the appellant's car. The appellant and the driver got out of their car and the driver shot two of the brothers, killing one. Before the shooting, the appellant yelled at the driver to "Shoot the fucking Mexican!" Also, testimony indicated that the rifle used in the shooting had been stolen by the appellant and his friends shortly before returning to the girls' home. The appellant got back in the car, drove the car between the shooter and the remaining brothers, picked up the shooter, and then drove off. The appellant

confessed to the above events, but had a "flippant" attitude towards the crime.[3] He was sent to a minimum security prison unit in Kansas.

While in the Kansas jail for his part in the shooting, the appellant retaliated against a correctional officer who had reported him for a disciplinary violation by hitting her in the arm.[4] The officer said that the appellant was "smuggish" about this violation and gave an insincere apology. The corrections officer testified that the appellant escaped with one month left on his sentence.

Also, while incarcerated in the Pecos County jail for the instant offense, the appellant admitted to a cellmate that killing Hudson fulfilled his life's goals and that he "slept like a baby" the night after the murder. The appellant also perverted the lyrics to the Bob Marley song "I Shot the Sheriff," singing in his cell, "I shot the Sheriff but in my case it was the deputy."

After a 1996 cell and strip search conducted by Pecos County jailers, the appellant became enraged that jailers had "tor[n] up his stuff." He destroyed several light fixtures and a TV in the day room, and his cell door window. In the process, he threw light bulbs and other debris through the bars and at the deputies who were in the control room. He then started a fire by lighting his blanket. Before the appellant was finally subdued, he threatened to kill the first person through the door.

Furthermore, various Pecos County law enforcement officers characterized the appellant as very aggressive and more aggressive than most inmates, a danger to both the inmates and the prison personnel,

---

3. In fact, the Kansas sheriff testified that the appellant and his friends were laughing and joking about the crime.

4. The testimony revealed that touching a guard at the Kansas facility was considered a "very serious offense."

and a dominating force in the prison. One witness described the appellant as having "moods," one day he could be as "docile as can be," and the next day he could be a "raging, crazy, human being." In addition, prison personnel often discovered contraband, including a shank and pieces of metal, in the appellant's cell. Although the appellant did not use a shank against other inmates, he had assaulted other inmates, some of which were "serious fights." The appellant had also grabbed a deputy through the cell bars, which resulted in a minor scuffle.[5] Each witness, whether from Kansas or Texas, who was asked about the appellant's reputation for being a peaceful person answered that they thought it was bad.[6]

There was no psychiatric evidence presented or evidence concerning the appellant's background. The appellant was twenty-two years old at the time of the offense.

The evidence concerning the appellant's future dangerousness supports the jury's verdict. The appellant and his cousin, both fugitives from a correctional facility, pillaged their way from Kansas to West Texas, ultimately shooting at and killing a police officer who had not threatened them other than by flashing his lights and pulling up along side them. Throughout their flight, their behavior of switching vehicles and evading local peace officers, shooting firearms, and fleeing at speeds in excess of 100 miles per hour, exhibited both forethought and deliberateness to avoid capture from their escape from Kansas as well as a disregard for the lives of their pur-

suers and innocent bystanders. The murder of Officer Hudson also shows an increasing disrespect for human life, as the appellant evolved from an accomplice encouraging the murder in Kansas to the triggerman himself in Texas. *See King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997) (an escalating pattern of disrespect for the law supports a finding of future dangerousness). Furthermore, shortly after the appellant was caught, he expressed no remorse and had a cavalier attitude about having killed Officer Hudson. *See Rachal v. State*, 917 S.W.2d 799, 806 (Tex. Crim.App.1996) (lack of remorse may be a factor in determining future dangerousness). Finally, the evidence of the appellant's violent behavior in prison reveals his continuing volatility and bad character. The evidence shows a person who has a temper, is aggressive, dangerous, violent, and dominating-a danger to those around him. After viewing the evidence in the light most favorable to the verdict, we hold that a rational jury could have reasonably concluded that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. *Allridge*, 850 S.W.2d at 487. **We overrule point of error one.**

In points of error two, three, and five, the appellant alleges that we should reverse and remand this case for a new trial on guilt-innocence or nullify the third punishment hearing under the doctrine of collateral estoppel because the trial court did not submit a deliberateness issue to the jury following the punishment phase of the second trial.[7]

---

**5.** The deputy testified that it was unclear whether the appellant was trying to escape or angry with the deputy for not getting him a cup of ice.

**6.** In fact, one woman testified in response to defense counsel's question that she did not

think that the appellant had any good or redeeming qualities.

**7.** We remanded the case on punishment because the trial court failed to submit the deliberateness issue at the punishment phase of the second trial. *See Smith v. State*, 907 S.W.2d 522, 534 (Tex.Crim.App.1995) ("[b]y

■ Assuming without deciding that the appellant has not procedurally defaulted on these claims, the claims fail on the merits.[8] In his second point of error, the appellant argues that this Court's failure to reverse and remand on guilt-innocence, as well as punishment, violated the Sixth Amendment and due process. Because the "legislature defined capital murder punishment by death as including the element of deliberateness," *Powell v. State*, 897 S.W.2d 307, 318 (Tex.Crim.App.1994) (plurality opinion), *overruled by Prystash v. State*, 3 S.W.3d 522 (Tex.Crim.App. 1999), the appellant argues that the same jury should have considered the guilt-innocence phase and deliberateness special issue. The appellant also argues that treating the deliberateness issue as a special aggravating circumstance, affecting only a defendant's sentence, would exceed the constitutional limits on a state's power "to determine whether a jury's finding of fact about a crime is an element of the offense." [9]

The appellant mistakenly relies on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), for the proposition that a sentencing factor like deliberateness constitutes a fact finding that must be made by the same jury who determined guilt-innocence. In *Apprendi*, the United States Supreme Court found that a New Jersey hate crime statute violated the Fourteenth Amendment's guarantee of due process because it allowed sentence enhancement (the effect of which was to turn a second-degree felony into a first-degree felony) based upon the judge's fact finding of racial motivation by a preponderance of the evidence. *Apprendi*, 530 U.S. at 491–92, 120 S.Ct. 2348. The Supreme Court's decision to strike down the New Jersey statute turned on its constitutional rule that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348.

First, despite the language quoted by the appellant in *Powell*, we did not treat "deliberateness" as an element of capital murder. We remanded the case to the trial court under article 44.29(c) for a new punishment hearing, but affirmed the determination of guilt for capital murder. *Powell*, 897 S.W.2d at 318. There was no

---

failing to give [the deliberateness] question at trial, the court received an incomplete verdict and thus was without the authority to sentence appellant to death"). The trial court did submit the deliberateness issue after the third punishment phase, from which the appellant now appeals: "Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of TIM HUDSON was committed deliberately and with reasonable expectation that the death of TIM HUDSON or another would result?"

8. The State argues that the appellant has procedurally defaulted points of error two, three and five. *See* Tex.R.App. P. 33.1(a)(1); *cf. Clark v. State*, 994 S.W.2d 166, 169 (Tex.Crim. App.1999) (Johnson, J., concurring) (arguing that issues regarding this Court's ability to

remand a case for a new punishment phase alone raised for the first time after order for remand on punishment and conclusion of new punishment phase are procedurally defaulted).

9. The appellant also argues that the issue of deliberateness has three other qualities to distinguish it from an "ordinary statutory aggravating factor": (1) it defines a culpable mental state, (2) that had to exist to make homicide a capital offense under Texas law regardless of any of the other circumstances of the crime, and (3) the double jeopardy clause bars the State from seeking the death penalty at a retrial if the evidence was legally insufficient to prove it. The appellant fails to support or clearly argue this position. Tex. R.App. P. 38.1(h).

suggestion that the omission of the deliberateness special issue somehow negated the determination of guilt of capital murder. *Id.; Smith v. State,* 907 S.W.2d at 534. If anything, the quoted language in *Powell* should be read to mean that the "deliberateness" special issue is an element of the death penalty, not of capital murder.

Second, even if we consider "deliberateness" to be an element of capital murder, the Texas scheme complies with *Apprendi's* constitutional rule—the deliberateness special issue is answered by the jury and proved by the State beyond a reasonable doubt. *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348; Art. 37.0711 § 3(c).

■ Finally, we see nothing in *Apprendi* that suggests that the same jury must consider the guilt-innocence and punishment phases where the trial court submits an issue of deliberateness, as the appellant argues. *Apprendi* requires only that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to *a* jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348 (emphasis added). As we pointed out above, the Texas scheme follows *Apprendi's* constitutional rule. We may reverse and remand any capital case for a punishment hearing alone before a new jury. *See Ransom v. State,* 920 S.W.2d 288, 297–98 (Tex.Crim. App.1994); *Smith,* 907 S.W.2d at 534; *Powell,* 897 S.W.2d at 318. The appellant fails to convince us that he suffered a Sixth

Amendment or due process violation. **We overrule point of error two.**

■ In his third point of error, the appellant argues that the State waived its right to submit the issue of deliberateness in the third punishment phase hearing because it failed to have the trial court present the issue at the retrial.

■ For offenses committed before September 1, 1991, the trial court is required to include the deliberateness special issue in the jury charge at the punishment phase. Art. 37.0711 § 3(c); *Powell,* 897 S.W.2d at 316–18. The inclusion of the deliberateness special issue is a directive of the trial court and not a right of the parties; it may not be waived by the litigants. *Busby v. State,* 990 S.W.2d 263, 268 (Tex.Crim.App.1999) (citing *Powell* for the proposition that the deliberateness special issue cannot be waived); *Powell,* 897 S.W.2d at 316–318; *cf. Ex parte McJunkins,* 954 S.W.2d 39, 40 (Tex.Crim. App.1997) (noting that Penal Code section 3.03 is a right of the litigants that may be waived, as opposed to article 42.12, section 3(g)(a), which is an absolute directive or prohibition on the trial court). A defendant, however, is estopped from complaining on appeal of the omission of the deliberateness special issue if the defendant invites the error of omission. *Prystash,* 3 S.W.3d at 532. Here, neither the defendant nor the State invited the error of omission; the State did not procedurally default.[10] *Id.; Busby,* 990 S.W.2d at 268; *Powell,* 897 S.W.2d at 316–318. **We overrule point of error three.[11]**

10. The appellant's argument is counterintuitive. The deliberateness special issue helps the defendant and is an extra burden for the State. Because of the benefit received by the appellant from its inclusion in the charge, his argument seems backwards; there is a more logical argument that the defendant waived the deliberateness special issue himself. Because it is the trial court's duty to include the

deliberateness special issue, however, and the defendant did not invite the error, the defendant did not procedurally default on the inclusion of the special issue.

11. Furthermore, we do not treat omissions of the deliberateness special issue as a "waiver." *Smith,* 907 S.W.2d at 534 (remanding for a new punishment phase hearing because of the

In his fifth point of error, the appellant alleges that the doctrine of collateral estoppel precluded the State from presenting the deliberateness issue at the punishment rehearing. Collateral estoppel, one of the protections provided by the Fifth Amendment guarantee against double jeopardy, simply means that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit. *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

The deliberateness issue was not submitted to the jury in the 1992 punishment hearing. Accordingly, the issue was not determined in the 1992 punishment hearing. Because the issue was not determined in the 1992 punishment hearing, the doctrine of collateral estoppel is inapplicable.[12] *Ashe,* 397 U.S. at 443, 90 S.Ct. 1189. **We overrule point of error five.**

In his fourth point of error, the appellant argues that his death sentence should be reformed to life in prison because executing him after he has served at least twelve years in prison waiting for the State to give him a fair trial would violate the Eighth Amendment. The appellant's claim is without merit.

Not only has the delay effectuated an ultimately sound conviction and punishment proceeding, the appellant fails to produce any evidence that the State abused the system, despite the retrials. We therefore look to the Supreme Court to determine whether the length of the delay *per se* has violated his Eighth Amendment rights. The Supreme Court has interpreted the cruel and unusual clause to prohibit punishment that offends the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion). In determining what standards have "evolved," the Supreme Court has looked to the standards of "modern American society as a whole." *Stanford v. Kentucky,* 492 U.S. 361, 369, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). The present standards of decency do not deem cruel and unusual the delay occasioned while a condemned prisoner pursues direct appeals and collateral relief. The United States Courts of Appeals have determined that a delay in excess of thirteen years between sentencing and execution does not constitute cruel and unusual punishment. *E.g. White v. Johnson,* 79 F.3d 432, 439–40 (5th Cir.1996) (rejecting claim that to execute death-sentenced inmate after pursuing appeals and collateral relief for seventeen years is cruel and unusual); *McKenzie v. Day,* 57 F.3d 1493, 1494 (9th Cir.1995) (rejecting claim that to execute death-sentenced inmate after pursuing appeals and collateral relief for approximately two decades is cruel and unusual). State courts have also rejected this issue. *E.g. Bell v. State,* 938 S.W.2d 35, 53 (Tex.Crim.App. 1996) (rejecting claim that to execute death-sentenced inmate after nearly twenty-years after pursuing appeals is cruel and unusual); *Hitchcock v. State,* 578 So.2d 685, 693 (Fla.1990) (rejecting claim that to execute death-sentenced petitioner after pursuing appeals and collateral relief for twelve years is cruel and unusual),

omission of the deliberateness special issue); *Powell,* 897 S.W.2d at 318 (same); *cf. Prystash,* 3 S.W.3d at 532 ("But we do not treat omissions of the elements of the offense as waivers.").

**12.** *Ex parte Tarver,* 725 S.W.2d 195 (Tex.Crim. App.1986) is not applicable in this case. In *Tarver,* the trial court in the prior proceeding had expressly found an allegation to be untrue. *Id.* at 198. No such determination was made in this case.

*rev'd on other grounds,* 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992); *People v. Chessman,* 52 Cal.2d 467, 341 P.2d 679, 699–700 (1959) (rejecting claim that to execute death-sentenced petitioner after pursuing appeals and collateral relief for more than eleven years is cruel and unusual), *overruled on other grounds, People v. Morse,* 60 Cal.2d 631, 36 Cal.Rptr. 201, 388 P.2d 33 (1964). The approximate thirteen years the appellant has spent challenging his conviction and sentence is not *a fortiori* unconstitutionally cruel and unusual. **We overrule point of error four.**

Finding no reversible error, we affirm the judgment of the trial court.