

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. AP-77,064

---

### WILLIAM MICHAEL MASON, Appellant

### v.

### THE STATE OF TEXAS

---

### ON DIRECT APPEAL
### FROM CAUSE NO. 0620074 IN THE 228TH DISTRICT COURT
### HARRIS COUNTY

---

**ALCALA, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

In 1992, a jury convicted appellant of capital murder for the 1991 kidnapping and murder of his wife, Deborah Mason. *See* TEX. PENAL CODE § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure article 37.071, section 2(b), the trial judge sentenced appellant to death. TEX. CODE CRIM. PROC.

art. 37.071, § 2(g)(1990).[1]   His conviction and sentence were affirmed on direct appeal.

*Mason v. State*, 905 S.W.2d 570 (Tex. Crim. App. 1995).  However, in a claim raised in his

first subsequent habeas application, this Court granted appellant relief, vacated his sentence,

and remanded his case to the trial court for a new punishment hearing.[2]  *Ex parte Mason*, No.

AP-76,997 (Tex. Crim. App. Mar. 20, 2013) (not designated for publication).

The trial court held a new punishment hearing in 2015.  Based on the jury's answers

to the special issues, the trial judge sentenced appellant to death.  Art. 37.0711, § 3(g).

Direct appeal to this Court is automatic.  Art. 37.0711, § 3(j).  Appellant raises eight points

of error, and we find them to be without merit.   Consequently, we affirm the trial court's

judgment and sentence of death.  We explain our conclusion by reviewing the background

of this case and then by discussing each of the eight issues in turn.

## I. Background

The evidence presented at the punishment hearing showed appellant had a lengthy

criminal history.  In 1977, within seven months after he was released from prison, appellant,

his wife Deborah, and some friends were driving around and drinking when they came across

a car in the middle of the road.  The party stopped to push the car out of the way and

discovered Curtis Henry, an African-American man, passed out in the driver's seat.  When

---

[1]  Unless otherwise indicated, all future references to Articles refer to the Code of Criminal Procedure.

[2]  The allegation was that the trial court erred in denying appellant's properly requested mitigation instruction at punishment and providing instead a nullification instruction that did not allow the jury to consider and give effect to mitigating evidence presented at trial.

they could not wake Henry, appellant told his friends that he was going to show them how to kill an African-American, referring to Henry with a racial epithet. Appellant then shot Henry in the head. Appellant later bragged to his friends about the murder.

After Henry's murder, appellant fled to California where he was arrested. Appellant was returned to Texas and pleaded guilty to murdering Henry. While awaiting sentencing, appellant escaped from custody and was found outside the jail hiding in a barrel. He was sentenced to 55 years in prison for the murder. He was also sentenced to that same term of years for an aggravated robbery that he committed before that murder. While in custody for Henry's murder, appellant joined and became a high-ranking member of the Aryan Brotherhood of Texas, a prison gang.

Eighteen days after being paroled from those convictions, appellant committed the instant crime, the murder of his wife, Deborah. Appellant was at Deborah's home with his daughter, Mandy Mason; his brother, Lonnie Carney; his brother's friend, Thomas Mullins; and Deborah and her two-year-old son. At some point, appellant complained about the volume of the radio and got into an argument with Deborah in her bedroom. Appellant slapped and beat Deborah while she cried for him to stop, saying, "I love you. Don't hit me." Appellant called Deborah a "whore" and a "bitch," and said he was going to kill her. Appellant came out of the bedroom and told Carney to call Carney's brother-in-law, Terry Goodman. He instructed Carney to tell Goodman to come over and bring plastic trash bags. After Goodman arrived, Mullins, Carney, and Mandy left Deborah's house and went to the

home of appellant's mother, Juanita.  Goodman and his wife also went to Juanita's home.

Appellant later also drove there in Deborah's car.

Appellant, Carney, and Goodman left Juanita's home and drove Deborah's car to the

San Jacinto River.  Deborah was placed in the trunk of the car, hogtied, gagged, and stuffed

into trash bags.  At the river, appellant took Deborah out of the car, still in the bags, and

smashed her head with a concrete rock.  He then threw Deborah into the river.  When the

men later returned to Juanita's home, appellant told Carney and Mullins to tell the police that

Deborah had left Juanita's house in a car with two black men.  Deborah's two-year-old son

was left alone in her house overnight.

Eleven days after she was killed, Deborah's body was found in the San Jacinto River.

The medical examiner determined that Deborah's death was the "result of a skull fracture

with cerebral contusions due to blunt traumas (2) of the head."

During the period of time between Deborah's death and appellant's arrest, appellant

brutally assaulted his niece, Misty Mason, after she accepted a ride home from a friend who

was African-American and Mexican.  Mandy and appellant were present when Misty arrived

home.  Misty and Mandy got into an argument.  Appellant grabbed Misty by the hair and

threw her to the floor.  While Mandy held Misty's feet, appellant cut off all of Misty's hair

with a switchblade.  Appellant told Misty that he was doing this because she "came home

with a black person." Appellant also shaved off Misty's eyebrows, made her strip naked, and

shaved her private parts. Appellant then invited people from the neighborhood into the house

to view her in this condition.

In addition to the above evidence, the jury learned that appellant was previously convicted in 1973 of theft, "assault to murder with malice aforethought," and burglary with intent to commit theft. Furthermore, while incarcerated in this case, appellant was cited for numerous acts of misconduct, including possession of a shank, an attack on a guard with appellant's leg irons, and threats to kill the guard and witnesses.

Appellant presented evidence of his troubled childhood, which included his having alcoholic parents and step-parents, physical abuse of him, and his own alcohol and drug use. Intelligence testing showed his intellect as low to average. Several witnesses who encountered appellant while he was incarcerated testified that he was often polite, good-humored, and respectful. Appellant, now in his 60s, also presented evidence of his significant health problems, including: diabetes, which necessitates the regular use of insulin; hypertension; chronic pain; and neuropathy. Appellant also requires the aid of a walker to move around.

After appellant was sentenced to death, new appellate counsel filed a motion for new trial asserting six grounds, but none of the grounds complained of ineffective assistance of counsel and thus no evidence in support of that ground was introduced. The grounds were: (1) insufficient evidence to support the jury's determination that appellant, currently, is a future danger, (2) the future dangerousness special issue is unconstitutional as applied to appellant, (3) carrying out appellant's execution is impractical, (4) executing appellant does

not serve the penological goals of the death penalty, (5) appellant's execution would be cruel and unusual punishment, and (6) appellant's time on death row and in solitary confinement constitute cruel and unusual punishment.  The trial court held an evidentiary hearing on the motion.  Trial counsel testified that appellant's poor health negated his potential for future danger, rendering his death sentence unconstitutional and impractical.  He testified that appellant suffered from numerous health issues, that he would need regular dialysis soon, that appellant had problems with mobility, and that, during trial, appellant would occasionally wince from pain from bending over too quickly and he complained of pain from sitting for long periods.  Counsel also testified that he did not view appellant as a future danger given appellant's declining health.  In closing, appellate counsel argued that appellant is a sixty-one-year-old man in declining health that will only worsen in prison.  Appellant's counsel argued that, based on life expectancy, living conditions in prison, time until execution was actually imposed, costs of incarceration, and appellant's failing health, a death sentence for appellant would serve no penological purpose, was cruel and unusual, and was unlikely to be carried out before appellant died of natural causes.  The trial court denied the motion for new trial.

## II. Jury's Knowledge of Prior Death Sentence

In point of error one, appellant alleges that he was denied his Sixth Amendment right to effective assistance of counsel.  He specifically contends that his trial counsel were ineffective by (1) failing to object to statements by the trial judge advising venire members

that appellant had previously been sentenced to death, and (2) permitting statements throughout the punishment retrial informing jurors that appellant had previously been sentenced to death. Appellant argues that these failures by counsel "predispose[d] the jury into rendering a sentence of death." He asserts that, but for trial counsel's errors, there is a reasonable probability that he would have received a life sentence. Appellant also argues in point of error one that he was denied his right to due process when the jury learned of his previous death sentence in his punishment retrial. In his second point of error, appellant contends that the trial court improperly commented on the weight of the evidence by informing the jury about his prior death sentence. We address each of these complaints in turn.

**A. Ineffective Assistance of Counsel**

We address the applicable law before analyzing the events at trial. The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Martinez*, 330 S.W.3d 891, 900 (Tex. Crim. App. 2011). To prevail on an ineffective assistance of counsel claim, an appellant must prove that his trial counsel's performance was deficient and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Martinez*, 330 S.W.3d at 900.

Under *Strickland*'s first prong, an appellant must prove deficient performance by showing that his counsel's performance fell below an objective standard of reasonableness. 466 U.S. at 688-89. An objective standard of reasonableness is defined by prevailing

professional norms at the time of trial, and there is a strong presumption that counsel's performance conformed to those norms. *Id.* To overcome the presumption, an appellant must rely on evidence of counsel's deficiency affirmatively demonstrated in the record. *Id.*; *Lopez v. State*, 343 S.W.3d 137, 142-43 (Tex. Crim. App. 2011). We review counsel's performance by considering the totality of the circumstances as they existed at the time of trial, without the benefit of hindsight and without relying only on isolated circumstances at trial. *See Ex parte Flores*, 387 S.W.3d 626, 633-34 (Tex. Crim. App. 2012). Ordinarily, this Court will not find an attorney ineffective in the absence of a record of his rationale if there is any plausible strategic reason for his action or inaction. *Villa v. State*, 417 S.W.3d 455, 463 (Tex. Crim. App. 2013). However, when no reasonable trial strategy could justify his conduct, counsel's conduct is deficient as a matter of law, regardless of whether the record adequately reflects his motivations for employing that strategy. *Andrews v. State*, 159 S.W.3d 98, 102-03 (Tex. Crim. App. 2005).

Under *Strickland*'s second prong, an appellant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

The voir dire record reflects that defense counsel made the decision before trial to inform the jury about appellant's prior death sentence:

> [STATE]: Judge, can we put something on the record? It's one of those things I meant to do earlier. It's quick. But it's about handling the previous

conviction and sentence that before we started all this, we had a discussion, the State, the Defense with you and that it was their preference to handle it that the jury knew and address it up front.

THE COURT:    Go ahead.

[STATE]:    Put that in there that that's what happened.

* * *

THE COURT:    Now, what is this that you want to put on the record?

[STATE]:    Just that we had a discussion how we were going to address this case being so old and being back in front of them when we were all present and the decision was made, I think with everybody that there was no way around it, is the word I remember, of addressing it up front and then that was the preference that they would know this case was tried before and to see how they felt about it if they wanted to talk about it.  And I was told I need to have that on the record that that's why we're handling it that way.

[DEFENSE]:    That's fine, I agree.

THE COURT:    I think it's proper to do that.

The record shows that, during voir dire, the trial judge informed members of the panel that appellant had been tried and convicted of capital murder in 1992 and sentenced to death. The judge further informed the prospective jurors that, subsequent to appellant's conviction, "an appellate court reviewed this particular case and decided it was in the best interest of justice to have another punishment hearing."

The record also shows that, during the trial, defense counsel called numerous witnesses to testify about appellant's behavior, demeanor, and deteriorating health throughout his twenty-three years on death row.  Counsel emphasized to the jury that it had

additional information that the previous jury did not have to decide the future dangerousness issue.  In closing arguments, defense counsel stated, "You sit here today because you told us that you could fairly decide these issues knowing that a jury a long time ago sentenced [appellant] to death."  Counsel stressed that the jury had the benefit of knowing how appellant behaved and interacted with others, including inmates, correctional officers, and prison and medical staff while in prison, and thus, they were better informed to assess his potential for future dangerousness than the prior jury.  Additionally, suggesting that appellant would die from natural causes while confined in prison regardless of whether a death sentence was imposed, counsel highlighted appellant's ill health and advanced age.  But, because the motion for new trial did not allege a ground of ineffective assistance of counsel on this basis, defense counsel have not expressly explained their rationale for agreeing to permit the instant jury to learn about appellant's former death sentence.

Appellant's challenge to the first prong is that counsel's strategy was unreasonable as a matter of law, in that "no reasonable trial strategy could justify the trial counsel's conduct" in permitting the jury to learn about appellant's prior death sentence that had been reversed so as to result in this retrial. *Andrews*, 159 S.W.3d at 102.  Ordinarily, under the rules of appellate procedure, a jury may not learn about a defendant's previous sentence before or during a retrial. *See* TEX. R. APP. P. 21.9.  Rule 21.9(d) states in pertinent part that, when a new punishment hearing is granted, the "assessment of punishment in the former trial may not be alluded to in the presence of the jury that hears the case on retrial of punishment."

Here, although he does not rely on or cite to this particular rule in his appellate brief, appellant's challenge to counsel's ineffectiveness invokes the substance of this rule by arguing that counsel should have objected to, rather than agreeing to, the jury's learning about appellant's previous death sentence.  Substantively, the question here is whether the record shows that counsel's chosen strategy was objectively unreasonable in light of the totality of the circumstances.  *Strickland*, 466 U.S. at 688-89.  In this case, although the new trial hearing did not include a record of counsel's rationale, the trial record does reveal the essence of the reasons for their theory to allow the jury to learn about appellant's prior death sentence.  *See id*.  They represented to the court that the instant jury likely would have surmised that appellant previously had been sentenced to death due to the length of time in confinement and that it was more beneficial to appellant to be candid about the prior sentence.  Furthermore, defense counsel believed that they could convince the instant jury that they should disregard the prior death sentence because they had more extensive information to gauge appellant's behavior than the prior jury's more limited information from two decades ago.  There are persuasive arguments in favor of and against the position that counsel should not have permitted the jury on retrial to learn about appellant's former death sentence.  But, we need not definitely resolve appellant's complaint with respect to the first prong because, even were we to accept his argument that counsel's strategy was objectively unreasonable, appellant has failed to meet *Strickland*'s prejudice prong. *See id.* at 694.

The State presented overwhelming evidence at punishment to show that appellant would be a future danger to society. Based on the record before us, therefore, appellant fails

to show that there is a reasonable probability that the outcome would have been different had defense counsel either objected to the complained-of evidence or requested a specific instruction for the jury not to consider it. *Id.*

The record shows that appellant has committed racially prejudiced and other violence in and out of prison for most of his adult life. Based on a racial motive, he killed a stranger, who was an African-American man, by shooting him in the head. Soon after his parole for that offense, appellant killed Deborah by beating her, placing her inside plastic trash bags, kidnapping her in the trunk of her car, bashing her skull with a concrete rock, and throwing her into a river. After that, he brutally assaulted his niece Misty for being in the company of an African-American young man. While awaiting his capital murder trial, appellant told others that he was trying to have witnesses killed. The jury also heard evidence of the numerous violent acts appellant committed against his family members, his previous violent felony convictions, and his lengthy jail disciplinary record which included an escape attempt, threats to staff, and an assault of a guard. While awaiting his new punishment hearing, appellant was cited for numerous threats and bad acts, including attacking a guard with leg irons, and threatening to kill that guard – all while appellant was reportedly in need of a walker or cane in order to move around. The record also shows that appellant was a high-ranking member of the Aryan Brotherhood of Texas, a racist and violent prison gang. In contrast, appellant's defense evidence lacked persuasive value to minimize the probative impact of this evidence. Given the extreme brutality and number of violent offenses committed by appellant inside and outside of prison, appellant fails to show that, but for the

jury's knowledge of his previous death sentence, there is a reasonable probability that the jury would have answered the special issues differently.  Accordingly, regardless of whether counsel's strategy here fell below an objective standard of reasonableness, we conclude that appellant has failed to establish prejudice resulting from counsel's decision to permit the jury to learn of his prior death sentence.

**B. Due Process**

We similarly conclude that appellant has failed to show that he was denied due process as a result of the introduction of information about his prior death sentence.  The United States Supreme Court has held that the introduction of evidence of an earlier death sentence does not amount to constitutional error when the evidence did not "affirmatively [mislead] the jury regarding its role in the sentencing process so as to diminish its sense of responsibility." *Romano v. Oklahoma*, 512 U.S. 1, 10 (1994); *see also Muniz v. Johnson*, 132 F.3d 214, 223 (5th Cir. 1998).  While *Romano* was decided in the context of the jurors' knowledge of a death sentence for a separate murder, the holding is equally applicable where the prior sentence was for the same offense because the critical inquiry is whether the jury was "misled in its sentencing role." *See Muniz*, 132 F.3d at 223-24.

Here, in light of all of the evidence submitted during the punishment retrial, appellant's contention that the jury's knowledge of his previous death sentence so infected its consideration of other evidence as to amount to a denial of due process lacks merit.  To the contrary, the jury was informed that it had a litany of favorable evidence that the prior jury did not, such as knowledge of how appellant had conducted himself in prison for over

twenty years, and was instructed to consider all of the evidence presented in answering the special issues. Because appellant has failed to show that the jury was affirmatively misled regarding its responsibility in the sentencing process, we reject his due process complaint. Point of error one is overruled.

**C. Comment on the Weight of the Evidence**

In point of error two, appellant argues that the trial court improperly commented on the weight of the evidence by informing the venire that appellant had been previously sentenced to death. He asserts that this violated his Sixth Amendment right to a fair trial and his Fourteenth Amendment right to due process.[3]

As discussed above, the record shows that the trial court informed each prospective juror panel, prior to individual voir dire, that appellant had previously been convicted of capital murder and sentenced to death. He further told the panels that appellant's sentence had been overturned and this case was a trial on punishment only. Prior to the trial court making these comments, the State and defense counsel had agreed that the jury would be informed of appellant's previous sentence.

In resolving this issue, we again note that Rule of Appellate Procedure 21.9 provides that, in the event of resentencing, a former sentence "may not be alluded to in the presence

---

[3]    Appellant also alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment. Appellant, however, has failed to provide separate argument or authority in support of his Eighth Amendment claim. Therefore, we decline to address this claim because it is inadequately briefed. *See* Rule 38.1.

of the jury that hears the case on retrial of punishment." TEX. R. APP. P. 21.9.  Appellant,

however, does not complain about a violation of this procedural rule—instead his complaint

is that the trial court's comments here rose to the level of a due process violation and

infringed upon his right to a fair trial.  *See Ex parte Carter*, 521 S.W.3d 344, 349 (Tex. Crim.

App. 2017) (distinguishing between violations of constitutional rights and statutory or

procedural violations, and stating that, while "procedural errors or statutory violations may

be reversible error," they "are not necessarily fundamental or constitutional errors").

Because appellant's arguments here are limited to an alleged violation of his constitutional

rights, we will consider only that question.  For the same reasons that appellant failed to

demonstrate a constitutional violation or harm in point of error one—either due to the fact

that the trial court's comments did not mislead the jury regarding its role in the sentencing

process, or in light of the overwhelming evidence supporting the jury's punishment verdict—

we conclude that appellant also fails to demonstrate a constitutional violation here.  Point of

error two is overruled.

### III. Future Dangerousness Special Issue

The future dangerousness special issue requires the State to prove beyond a reasonable

doubt that there is a probability that appellant "would commit criminal acts of violence that

would constitute a continuing threat to society."  Art. 37.0711, § 3(b)(2).  In his third point

of error, appellant argues that this issue was unconstitutional "as applied" to him because it

did not permit the jury to consider his current physical circumstances and limitations.

However, nothing about the future dangerousness issue limits appellant's ability to present

such evidence or limits the jury's ability to consider such evidence in answering the question.

Appellant argues that this Court's opinion in *Jurek v. State* limits the factors that a jury may consider when answering the future dangerousness issue.[4] 522 S.W.2d 934, 939-40 (Tex. Crim. App. 1975), *aff'd*, *Jurek v. Texas*, 428 U.S. 262 (1976).  To the contrary, this Court specifically held that the future dangerousness special issue allows for discretion from jurors. *Id*.  This discretion, in turn, ensures "individualization based on consideration of all extenuating circumstances." *Id.* ("We are inclined to believe that the factors which determine whether the sentence of death is an appropriate penalty in a particular case are too complex to be compressed within the limits of a simple formula.").  Therefore, nothing about our opinion in *Jurek* limits evidence or a jury's consideration to only those exemplars enumerated in that case. *See id.* at 939-40.

Here, the record shows that the jury heard extensive evidence of appellant's current physical circumstances and health issues.  In asking for a life sentence, appellant argued that

---

[4]  In *Jurek v. State*, we noted the following:

> However, there are some factors which are readily apparent and are viable factors for the jury's consideration.  In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record.  It could consider the range and severity of his prior criminal conduct.  It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another.  It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand.

522 S.W.2d 934, 939-40 (Tex. Crim. App. 1975).

he was too ill to be a future danger.  Through each of the special issues, the jurors were permitted to consider all of the evidence presented, including evidence of appellant's "unique physical circumstances and limitations."  *See Hughes v. State*, 897 S.W.2d 285, 299 (Tex. Crim. App. 1994) (rejecting appellant's claim that Article 37.071 is unconstitutional as applied to him by reasoning that evidence of his mental and emotional instability could be considered within the scope of the special issues).

The future dangerousness special issue was not unconstitutional as applied to appellant.  Point of error three is overruled.

### IV. Mitigation Special Issue

In point of error four, appellant contends that the mitigation special issue was unconstitutional as applied to him because it limited the type of evidence that the jury could consider as mitigating.  He argues that the plain language of the issue limits the jury's consideration to "the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant."  *See* Art. 37.0711, § 3(e).  Thus, he contends that the issue fails to provide the jury a meaningful way to consider any mitigation evidence that does not fall within these categories, in violation of his right to a fair trial, the prohibition against cruel and unusual punishment, and his right to due process under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Appellant cites to nowhere in the record, and we find no evidence in the record, that he specifically objected at trial that Article 37.0711 limited the type of evidence the jury could consider as mitigating or that the special issue was unconstitutional as applied to him.

To preserve error for appellate review, a party generally must present a timely objection to the trial court, state the specific grounds for the complaint, and obtain a ruling. Rule 33.1(a); *see also Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995) (holding that a specific objection is required to preserve an as-applied challenge to Article 37.071). Appellant failed to do so here. Therefore, he did not preserve his fourth point of error.

However, even if appellant had preserved his challenge to the statute, he would not prevail. The mitigation special issue as set out in Article 37.0711, § 3(e), and as provided to the jury, states:

> Whether, taking into consideration all of the evidence, *including* the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(Emphasis added). This Court has previously held that the term "including" is one of inclusion, not limitation. *State v. Vasilas*, 187 S.W.3d 486, 489-90 (Tex. Crim. App. 2006); *see also* TEX. GOV'T CODE § 311.005(13) ("'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded."). Therefore, the only limitation, if any, comes from whether the evidence was presented to the jury.

Appellant does not claim that he was prevented from presenting any mitigating evidence to the jury. The record shows that he presented extensive evidence that the jury could consider mitigating, such as his unstable upbringing, his abusive father figures, and his good behavior in prison over the twenty-three years that he was incarcerated before his

retrial.  He also presented evidence of his deteriorating health and his reliance on the aid of a walker.  Nothing about the language of the mitigation special issue restricted the jury's consideration of this evidence.  Therefore, the mitigation issue was not unconstitutional as applied to appellant.  Point of error four is overruled.

### V. Jury Charge Error

In his fifth point of error, appellant complains that the mitigation special issue in the abstract portion of the jury instructions was worded differently than it appears in the statute. The abstract portion of the charge instructed the jury as follows:

> In answering Special Issue No. 3 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's personal moral culpability, *including but not limited to*, evidence of the defendant's background, character, or the circumstances of the offense that mitigates against the imposition of the death penalty.

(Emphasis added).  Appellant specifically argues that the "including but not limited to" language in the abstract portion of the charge conflicts with the term "including" in the statutory issue.  *See* Article 37.0711, § 3(e).  Similar to his fourth point of error, appellant asserts that this conflict improperly limited the mitigating evidence that the jury considered. He contends this conflict violated his right to a fair trial, the prohibition against cruel and unusual punishment, and his right to due process under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

A jury charge that tracks the language of a particular statute is a proper charge.  *Coble v. State*, 330 S.W.3d 253, 297 (Tex. Crim. App. 2010) (finding no jury charge error when the mitigation special issue tracked the language of the mandated mitigation question in Article

37.0711).  Here, the language of the mitigation issue in the jury charge adequately tracked the language of the statute without changing the meaning of the statutory language.  *See* Article 37.0711, § 3(e).  Further, as we stated in point of error four, the language of the mitigation issue did not limit the jury from considering any and all mitigating evidence presented to the jury.  The remaining issue is whether the phrase "including but not limited to" in the abstract portion of the charge constituted error.

The abstract portion of the charge serves to guide the jury on the meaning of concepts and terms used in the application paragraphs of the charge.  *See Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012).  Here, though the abstract portion of the charge did not track the statute verbatim, it clarified that the jurors must consider *any* mitigating evidence when answering the mitigation issue and must not limit their consideration to specific categories of evidence.  Further, as noted above in our discussion of point of error four, the term "including" is one of enlargement and not of limitation or exclusive enumeration, and the complained-of abstract portion emphasized this meaning.  Thus, the abstract charge given was even more expansive than the statutory language.

We find no jury charge error.  Nothing about the abstract instruction was an incorrect or misleading statement of law.  *See id*. (holding that reversible error occurs in giving an abstract instruction only when the instruction is an incorrect or misleading statement of law that the jury needs to understand in order to implement the commands of the application paragraph).  The charge here properly instructed the jury to consider any of the trial evidence relevant to mitigation in answering the third special issue.  Point of error five is overruled.

## VI. Deliberateness Special Issue

In point of error six, appellant contends that the deliberateness issue is unconstitutionally vague on its face because the term "deliberately" is subject to various interpretations. Appellant did not preserve his complaint for appellate review by making a timely objection and obtaining a ruling from the trial court. Rule 33.1(a)(1). Moreover, as appellant concedes, this Court has previously decided that the deliberateness special issue is not unconstitutionally vague. *See Ramirez v. State*, 815 S.W.2d 636, 653 (Tex. Crim. App. 1991); *Smith v. State*, 683 S.W.2d 393, 410-11 (Tex. Crim. App. 1984). Appellant raises nothing new to persuade us to revisit the issue. Point of error six is overruled.

## VII. Time on Death Row

In his seventh point of error, appellant asserts that the nearly twenty-five years he spent confined on death row constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. We have previously addressed and rejected claims like this one. *See Smith v. State*, 74 S.W.3d 868, 875 (Tex. Crim. App. 2002) (finding the imposition of the death penalty for capital murder after the defendant served twelve years in prison did not constitute cruel and unusual punishment when he had been pursuing appeals and collateral relief); *Bell v. State*, 938 S.W.2d 35, 53 (Tex. Crim. App. 1996) (rejecting the claim that to execute a death-sentenced inmate after nearly twenty years in prison while pursuing appeals is cruel and unusual).

Appellant has availed himself of both the state and federal systems of appellate procedure and collateral review, and he was granted a new punishment hearing. As this

Court stated in *Smith*, "[t]he present standards of decency do not deem cruel and unusual the delay occasioned while a condemned prisoner pursues direct appeals and collateral relief." 74 S.W.3d at 875. We cannot conclude that, at this juncture of the direct appeal that is the result of a retrial obtained through previous litigation challenging a former sentence of death, appellant's constitutional rights have been violated by the delay. Point of error seven is overruled.

## VIII. Challenge for Cause

In his eighth point of error, appellant alleges that the trial court improperly denied his challenge for cause against venire member Daisy Talavera. Specifically, he asserts that Talavera was challengeable for cause pursuant to Article 35.16 because she (1) could not follow the trial court's instructions and assess deliberateness independently of a finding of intent, and (2) would find a defendant to be a continuing threat to society based on the fact that he murdered someone in the course of a kidnapping.

When a trial court erroneously overrules a defense challenge for cause against a venire person, a defendant is harmed only if he uses a peremptory strike to remove the venire person and then afterwards suffers a detriment from the loss of the strike. *Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007); *Chambers v. State*, 866 S.W.2d 9, 22 (Tex. Crim. App. 1993). Error is preserved for review only if appellant (1) used all of his peremptory strikes,[5] (2) asked for and was refused additional strikes, and (3) was then forced to accept

---

[5] *See* Article 35.15(a) ("In capital cases in which the State seeks the death penalty both
(continued...)

an identified objectionable juror that he would have otherwise struck and who actually sat on the jury. *Chambers*, 866 S.W.2d at 23. When these requirements are met, the trial court's erroneous denial of a defense challenge for cause harms the defendant by improperly depriving him of at least one of his statutory peremptory challenges that he could have used to remove the juror whom the defendant finds "objectionable." *Saldano*, 232 S.W.3d at 91.

In this case, the record shows that appellant exhausted his fifteen statutory peremptory strikes and requested additional strikes. The trial court granted appellant one additional peremptory strike which he immediately used. Appellant asked for and was denied a second additional peremptory strike. Appellant identified juror Michael Devries, the twelfth juror selected, as objectionable. Therefore, appellant preserved error.

However, because appellant was granted one additional peremptory strike, in order to demonstrate harm, he must show that the trial court erroneously denied his challenges for cause against at least two venire persons. *Newbury v. State*, 135 S.W.3d 22, 31 (Tex. Crim. App. 2004); *Chambers*, 866 S.W.2d at 23. But appellant alleges that only one of his challenges for cause was erroneously denied. Thus, he fails to show that he was wrongfully denied "the use of at least one of his allotted peremptory challenges." *Newbury,* 135 S.W.3d at 31. Therefore, even if we assume the trial court erroneously denied appellant's challenge to Talavera, appellant cannot demonstrate harm. Appellant's eighth point of error is overruled.

---

(...continued)
the State and the defendant shall be entitled to fifteen peremptory challenges.").

## IX. Conclusion

Having considered and overruled all of appellant's points of error, we uphold his

sentence.  We affirm the judgment of the trial court.

DELIVERED: September 19, 2018
DO NOT PUBLISH